# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**621**

**CA 11-01692**

PRESENT: SCUDDER, P.J., SMITH, CENTRA, AND LINDLEY, JJ.

---

IN THE MATTER OF THE JUDICIAL SETTLEMENT OF
THE INTERMEDIATE ACCOUNT OF HSBC BANK USA, N.A.
AS TRUSTEE OF THE TRUST UNDER AGREEMENT DATED
JANUARY 21, 1957, SEYMOUR H. KNOX, GRANTOR,
FOR THE BENEFIT OF THE ISSUE OF SEYMOUR H.
KNOX, III FOR THE PERIOD JANUARY 21, 1957 TO
NOVEMBER 3, 2005.

-------------------------------------------------      OPINION AND ORDER

HSBC BANK USA, N.A., PETITIONER-APPELLANT;

W.A. READ KNOX, SEYMOUR H. KNOX, IV, AVERY KNOX,
HELEN KEILHOLTZ, AND DANIEL C. OLIVERIO, AS
GUARDIAN AD LITEM FOR SEYMOUR H. KNOX, V, JOHN
CLAYTON KNOX, AND GEORGIA BROWN KNOX,
OBJECTANTS-RESPONDENTS.
(PROCEEDING NO. 1.)
(APPEAL NO. 2.)

---

HARRIS BEACH PLLC, BUFFALO (RICHARD T. SULLIVAN OF COUNSEL), AND BLAIR
& ROACH, TONAWANDA, FOR PETITIONER-APPELLANT.

DONALD G. MCGRATH, PLLC, WILLIAMSVILLE (DONALD G. MCGRATH OF COUNSEL),
AND DUKE, HOLZMAN, PHOTIADIS & GRESENS LLP, BUFFALO, FOR OBJECTANTS-
RESPONDENTS W.A. READ KNOX, SEYMOUR H. KNOX, IV, AVERY KNOX, AND HELEN
KEILHOLTZ.

HODGSON RUSS LLP, BUFFALO (DANIEL C. OLIVERIO OF COUNSEL), FOR
OBJECTANT-RESPONDENT DANIEL C. OLIVERIO, AS GUARDIAN AD LITEM FOR
SEYMOUR H. KNOX, V, JOHN CLAYTON KNOX, AND GEORGIA BROWN KNOX.

---

Appeal from a decree of the Surrogate's Court, Erie County
(Barbara Howe, S.), entered May 18, 2011.  The decree imposed
surcharges and fees on petitioner.

It is hereby ORDERED that the decree so appealed from is
unanimously modified on the law by vacating the determination of
liability with respect to amended objection No. 1 except insofar as
petitioner retained stock in F.W. Woolworth Company beyond March 1,
1995 and dismissing amended objection No. 2, filed by W.A. Read Knox,
Seymour H. Knox, IV, Avery Knox and Helen Keilholtz, by vacating the
determination of liability with respect to objection Nos. 1 and 9 and
objection Nos. 3 and 5 except insofar as petitioner retained stock in
F.W. Woolworth Company beyond March 1, 1995 and dismissing objection
Nos. 2, 4, 6, 7, 8 and 10, filed by Daniel C. Oliverio, as Guardian ad

Litem for Seymour H. Knox, V, John Clayton Knox, and Georgia Brown Knox, and vacating the award of surcharges, fees and expenses and as modified the decree is affirmed without costs and the matter is remitted to Surrogate's Court, Erie County, for further proceedings on the petition and for a recalculation of the amount of the surcharges in accordance with the following Opinion by SCUDDER, P.J.:

I

On January 21, 1957, Seymour H. Knox, II (Knox, II), executed a Trust Agreement establishing a trust "for the benefit of the issue of his son, Seymour H. Knox, III" (1957 Trust).  The Knox family co-founded F.W. Woolworth Company (Woolworth), and Knox, II served as a chairman of the board of petitioner's predecessor in interest, The Marine Trust Company of Western New York, which was also formerly known as Marine Midland Corporation, Marine Midland Bank-Western and Marine Midland Bank, N.A. (Marine).  When he established the 1957 Trust, Knox, II funded it with 5,000 shares of Woolworth capital stock and 5,200 shares of Marine common stock, making the "approximate size" of the 1957 Trust $325,525.  The 1957 Trust provided in relevant part that Marine, as petitioner's predecessor in interest, would be the sole Trustee.  The Trustee was given the power to invest and reinvest any and all of the funds "without regard to diversification or to limitations or restrictions of any kind."  Finally, as pertinent to this appeal, the 1957 Trust provided that the Trustee "may advise with counsel and shall be fully protected in respect of any action under this instrument taken, suffered or omitted in good faith by the Trustee in accordance with the opinion of counsel."  Notably, the 1957 Trust does not define who would qualify as "counsel," but the above-quoted sentence continues by authorizing the Trustee "to pay reasonable compensation to any counsel, attorneys and agents employed by it in the discharge of its duties."  We thus conclude that the term "counsel," in the context of the 1957 Trust, is not limited to legal counsel.

II

By petition dated July 13, 2006, petitioner sought, inter alia, judicial settlement of an "annexed intermediate Account . . . from January 21, 1957 through November 18, 2004" and acceptance of petitioner's resignation as Trustee.  The account annexed to the petition in the record on appeal, however, is labeled a "Final Account" and covers the period from January 21, 1957 through November 3, 2005.  All of the parties have used that Final Account as the basis for this appeal, and we do so as well.  We note that none of the parties contests the figures contained therein, and we therefore use that as the basis for our analysis.  Although the cost basis for the Marine stock was $12.399 per share, and the cost basis for the Woolworth stock was $5.186 per share, the Final Account lists the initial *inventory* value of those stocks as zero.  According to the Summary Statement and Schedule F of the Final Account, as of the time of the accounting, the 1957 Trust had increased in principal by over $1.75 million, had generated approximately $1.5 million in income and had $1.28 million in principal "on hand."

The four adult income beneficiaries, objectants Seymour H. Knox, IV, W.A. Read Knox, Avery Knox and Helen Keilholtz (collectively, adult objectants), filed objections and amended objections to the accounting.  In addition to objecting to the computation of commissions, the adult objectants objected "to the retention by the Trustee of 23,000 shares of Venator Group Inc. f/k/a F.W. Woolworth Co. . . . on the grounds that such retention of assets failed to comply with the prudent investor standard as provided for in EPTL 11-2.3 (b)."

A Guardian ad Litem (GAL) was appointed for the minor remainder beneficiaries[1], and he filed 10 objections to the accounting, contending, inter alia, that petitioner improperly abdicated its role as Trustee to Seymour H. Knox, III (Knox, III), failed to manage the 1957 Trust with due care in accordance with the law and petitioner's own internal protocols, and imprudently purchased and/or retained shares of various stocks including, but not limited to, Dome Petroleum LTD (Dome), Marine and Woolworth.

III

In February 2010, following a trial on liability, Surrogate's Court issued the order in appeal No. 4, the appeal from which must be dismissed pursuant to CPLR 5501 (a) (1).  By that order, the Surrogate determined that petitioner had breached its duties as Trustee insofar as it concerned the purchase and/or retention of six securities: Bristol Myers Co. and Bristol Myers Squibb (collectively, BMS); Digital Equipment Corp. (Digital); Dome; Leesona Corporation (Leesona); Marine; and Woolworth/Venator Group Inc.[2]  Because of certain stock distributions and/or mergers related to BMS and Digital, the 1957 Trust received shares in two unrelated securities:  Compaq Computer Corp. (Compaq) and Zimmer Holdings Inc. (Zimmer).  We thus include evidence relating to those two securities in our analysis. Because the Surrogate failed to specify divestiture dates, the GAL moved for clarification of the dates when certain stocks held by the 1957 Trust should have been sold, for purposes of the damages trial. Petitioner agreed that clarification was necessary, but disputed the dates used by the GAL in the motion.  In her divestiture order of June 17, 2010, the Surrogate determined that all of the Marine stock should have been sold on January 21, 1957, "the date of the inception and funding of the trust."  With respect to Woolworth, the Surrogate determined that 90% of the initial 5,000 shares should have been sold on January 21, 1957, and all remaining shares should have been sold on May 7, 1991.  The Surrogate did not set forth divestiture dates for any of the other securities until November 2010, when she issued an

---

[1]The 1957 Trust was to terminate upon the death of the survivor of Seymour H. Knox, IV and W.A. Read Knox and, therefore, objectants Avery Knox and Helen Keilholtz (siblings of Seymour Knox, IV and W.A. Read Knox who had not been born at the time the Trust was created) may be remainder beneficiaries in the event they outlive their brothers.

[2]In June 1998 all Woolworth stock was exchanged for stock in Venator Group, Inc.  We will refer to both collectively as Woolworth.

order adopting "in all respects" the damages calculations, including divestiture dates, of objectants' expert. Specifically, the Surrogate found damages for each stock as follows: BMS, $52,654; Digital, $1,514,693; Dome, $796,092; Leesona, $170,637; Marine, $7,815,541; and Woolworth, $11,087,467.

By the order in appeal No. 1, entered March 10, 2011, the Surrogate granted the respective motions of the GAL and the adult objectants seeking, inter alia, awards for guardian ad litem fees, attorneys' fees, and expenses. In the decree in appeal No. 2, and the statement for judgment in appeal No. 3, both of which were issued in May 2011, the Surrogate awarded damages in the amount of $21,437,084; $1,050,438 in fees and expenses for the GAL; $328,134 in attorneys' fees for the adult objectants' attorney, in addition to expenses; and $1,591,043 in interest from July 21, 2010 to the date of the decree. The appeals from the order in appeal No. 1 and the statement for judgment in appeal No. 3, as in appeal No. 4, likewise must be dismissed pursuant to CPLR 5501 (a) (1).

IV

With respect to the determination on liability, we conclude that the Surrogate erred in sustaining the objections, with the exception of those objections concerning the retention of Woolworth stock after March 1, 1995, the date of Woolworth's last dividend payment. This case is unique in that it involves a trust that had no precipitous decline in any particular stock, had a net increase in principal of over $1.75 million and generated over $1.5 million in income for the income beneficiaries. Although Dome and Leesona were sold for losses, the losses were negligible. According to Schedule B of the Final Account, the net total loss for Dome was $9,690, but that figure does not appear to include four in-kind distributions to beneficiaries, which are reflected in Schedule D-1 and had a total distribution value of $7,492. The net total loss for Leesona was $4,601. All of the other securities addressed by the Surrogate increased in value.

For example, Schedules A-1 and A-2 of the Final Account show that BMS had a gain of over $436,000, once the stock's inventory value was subtracted, and generated income of over $106,000. According to Schedule F of the Final Account, the 1957 Trust still retained 1,000 shares of BMS with a market value of approximately $21,000. In addition, Schedule E of the Final Account shows that the 1957 Trust received 300 shares of Zimmer in August 2001 as a result of a distribution from BMS. Schedule F of the Final Account establishes that those shares were still retained by the 1957 Trust and had a market value of over $19,000. According to those same schedules, Digital had a net gain of almost $150,000, although it did not generate any income. In addition, the 1957 Trust received 1,417.5 shares of Compaq in June 1998 as a result of a distribution from Digital. Those shares were sold for a net gain of over $17,000. Marine had a net gain of over $270,000, and generated over $180,000 in income for the 1957 Trust. Finally, Woolworth had a net gain of almost $380,000, and generated over $515,000 in income for the 1957 Trust.

V

We begin by discussing the standards of care applicable to fiduciaries such as petitioner.  From 1957 until 1970, the standard was the common-law rule, which provided that "the trustee is bound to employ such diligence and such prudence in the care and management, as in general, prudent [persons] of discretion and intelligence in such matters, employ in their own like affairs" (*King v Talbot*, 40 NY 76, 85-86; *see Matter of Hahn*, 93 AD2d 583, 586, *affd* 62 NY2d 821; *Matter of Clark*, 257 NY 132, 136).  From 1970 to 1995, the standard of care was the Prudent Person Rule established in EPTL 11-2.2 (a) (1), which provided that "[a] fiduciary holding funds for investment may invest the same in such securities as would be acquired by prudent [persons] of discretion and intelligence in such matters who are seeking a reasonable income and preservation of their capital" (*see Matter of Janes*, 90 NY2d 41, 49, *rearg denied* 90 NY2d 885; *Matter of Rowe*, 274 AD2d 87, 90-91, *lv denied* 96 NY2d 707).  That statute was viewed as a codification of the common-law rule established in *King* (*see Janes*, 90 NY2d at 49-50).

Effective January 1, 1995, the Prudent Investor Act (EPTL 11-2.3 [L 1994, ch 609, § 1]) created a new standard of care by providing that "[a] trustee shall exercise reasonable care, skill and caution to make and implement investment and management decisions as a prudent investor would for the entire portfolio, taking into account the purposes and terms and provisions of the governing instrument" (EPTL 11-2.3 [b] [2]).  The statute lists various elements of the prudent investor standard, including:  pursuing an overall investment strategy; considering numerous factors pertaining to the overall portfolio including, e.g., general economic conditions; and diversifying assets (*see* EPTL 11-2.3 [b] [3] [A] - [C]).  The Prudent Investor Act sets forth a higher standard of care for trustees with special investment skills (*see* EPTL 11-2.3 [b] [6]), which is similar to the higher standard of care that was added to the Prudent Person Rule in 1984 (*see* EPTL 11-2.2 [a] [1]; L 1984, ch 936; *see also* L 1987, ch 511, § 9).  Pursuant thereto, a trustee with specialized investment skills must "exercise such diligence in investing and managing assets as would customarily be exercised by prudent investors of discretion and intelligence having special investment skills" (EPTL 11-2.3 [b] [6]; *see* EPTL 11-2.2 [a] [1]).

Under all three standards, "it is not sufficient that hindsight might suggest that another course would have been more beneficial; nor does a mere error of investment judgment mandate a surcharge" (*Matter of Bank of N.Y.*, 35 NY2d 512, 519; *see Janes*, 223 AD2d 20, 26-27, *affd* 90 NY2d 41, *rearg denied* 90 NY2d 885; *Matter of Chase Manhattan Bank*, 26 AD3d 824, 828, *lv denied* 7 NY3d 824, *rearg denied* 7 NY3d 922; *Margesson v Bank of N.Y.*, 291 AD2d 694, 698, *amended on rearg on other grounds* 2002 WL 1289474, 2002 NY Slip Op 04812).

> "Investment decisions typically present a choice
> among myriad alternatives, some more or less
> prudent, and some imprudent, and the mere
> availability of other prudent courses of action

that a fiduciary could have pursued does not support a finding that the fiduciary acted imprudently in choosing one such course. Certainly, '[a]ll [persons] of honesty, prudence and enlightenment do not think alike' concerning investment decisions . . . For that reason, a fiduciary's conduct is not judged *strictly* by the success or failure of the investment . . . In short, the test is prudence, not performance, and therefore evidence of losses following the investment decision does not, by itself, establish imprudence . . . 'Our courts do not demand investment infallibility' . . ., and a fiduciary 'is neither insurer nor guarantor of the value of a trust's assets' " (*Janes*, 223 AD2d at 27 [emphasis added]).

Moreover, it is well established "that retention of securities received from the creator of the trust may be found to be prudent even when purchase of the same securities might not" (*Hahn*, 93 AD2d at 586; *see generally Matter of Weston*, 91 NY 502, 508).

To the extent that the GAL contended that petitioner was imprudent for failing to diversify the 1957 Trust's assets, we address in particular the standards concerning diversification.  Under either the common-law rule or the prudent person rule, the standard of care

" 'dictate[d] against any absolute rule that a fiduciary's failure to diversify, in and of itself, constitute[d] imprudence, as well as against a rule invariably immunizing a fiduciary from its failure to diversify in the absence of some selective list of elements of hazard' . . . Instead, the inquiry [was] 'simply whether, under all facts and circumstances of the particular case, the fiduciary violated the prudent person standard in maintaining a concentration of a particular stock in the [trust's] portfolio of investments' " (*Matter of Hunter*, 27 Misc 3d 1205[A], 2010 NY Slip Op 50548[U], *6, quoting *Janes*, 90 NY2d at 51).

On the other hand, the "Prudent Investor Act requires a trustee 'to diversify assets unless the trustee reasonably determines that it is in the interests of the beneficiaries not to diversify, taking into account the purposes and terms and provisions of the governing instrument' " (*Janes*, 90 NY2d at 49 n, quoting EPTL 11-2.3 [b] [3] [C]).

"The diversification mandate of the prudent investor rule is generally consistent with the diversification standards developed by the courts under the prudent person rule . . . Whether a trustee has acted in conformity with the prudent

investor rule is a determination made in light of
all surrounding facts and circumstances . . .
Thus, the prudent investor rule puts
diversification at the forefront of the
fiduciary's obligations, but allows leeway for the
fiduciary to opt out if the beneficiaries require
otherwise or if the testator/settlor directed a
different course of action" (*Hunter*, 2010 NY Slip
Op 50548[U], *6; *see* EPTL 11-2.3 [b] [1]; *Janes*,
90 NY2d at 49-50).

Regardless of the applicable standard of care, we recognize that
those standards of care have always been deemed subordinate to the
provisions of the governing instrument (*see* EPTL 11-2.2 [a] [1]; 11-
2.3 [a]; *Matter of David Small Trust*, 19 Misc 3d 1135[A], 2008 NY Slip
Op 51014[U], *2-*3, *mod on other grounds sub nom. Matter of
Manufacturers & Traders Trust Co.,* 66 AD3d 1377). "Thus[,] . . . 'in
a conflict between the governing instrument and [the statute(s)], the
governing instrument reigns supreme' " (*David Small Trust*, 2008 NY
Slip Op 51014[U], *3).

In order to warrant a surcharge, "the objectant must show that a
financial loss resulted from the trustee's negligence or failure" to
act prudently (*Matter of Bankers Trust Co. [Siegmund]*, 219 AD2d 266,
272, *lv dismissed* 87 NY2d 1055; *see Matter of Donner*, 82 NY2d 574,
585; *Hahn*, 93 AD2d at 586). If there is no causal connection between
the conduct and the loss, then there is no basis upon which to
surcharge the fiduciary (*see Hahn*, 93 AD2d at 587-588). We note that
" 'this Court [upon an appeal following] a nonjury trial is not
limited to determining whether the findings of the trial court are
supported by the weight of the credible evidence' " (*Matter of Saxton*,
274 AD2d 110, 118; *see Matter of Hyde*, 44 AD3d 1195, 1198, *lv denied* 9
NY3d 1027).

VI

Having addressed the standards of care and the general law
applicable to trusts, we now address the various objections at issue
on appeal. In their amended objection No. 1, the adult objectants
contended that petitioner acted imprudently in retaining 23,000 shares
of Woolworth stock. For the reasons that follow, we agree in part.
Although the adult objectants did not set forth a date when the stock
should have been sold, the evidence at the liability trial established
that the Woolworth stock was reduced to 23,000 shares after the sale
of 5,000 shares on February 20, 1997. At that point it is undisputed
that Woolworth stock was removed from petitioner's internal "hold
list," i.e., a list of securities that petitioner deemed acceptable to
be retained in trust portfolios. We recognize that blind adherence to
internal rules would not insulate petitioner from liability just as a
violation of internal rules would not automatically establish
imprudence, liability or loss. Here, however, petitioner's portfolio
manager conceded that the balance of Woolworth stock should have been
sold once the stock was removed from the hold list. We thus conclude
that the adult objectants established that petitioner acted

imprudently in retaining the 23,000 shares of Woolworth stock beyond February 20, 1997, and that the Surrogate properly sustained amended objection No. 1 of the adult objectants to that extent. However, for reasons discussed *infra*, we conclude that the actual divestiture date for the Woolworth stock should be March 1, 1995. We therefore conclude that the decree in appeal No. 2 should be modified accordingly.

In their amended objection No. 2, the adult objectants challenged the computation of petitioner's commissions. In the liability order, the Surrogate stated that she was sustaining "all" of the objections. In her subsequent order determining damages, however, the Surrogate concluded that "the commissions received thus far by [petitioner] need not be returned" to the 1957 Trust. It is thus clear that the Surrogate did not actually sustain amended objection No. 2 of the adult objectants, and we therefore do not address it further except to clarify in appeal No. 2 that it is dismissed. We thus further conclude that the decree in appeal No. 2 should be modified accordingly.

VII

Turning now to the objections raised by the GAL, we note that, in objection Nos. 1 and 9, the GAL alleges that petitioner failed to exercise the requisite diligence in investing and thus should be surcharged. Inasmuch as the more specific objections incorporate that general allegation, we see no need to analyze those general objections. We thus incorporate the analysis of GAL objection Nos. 1 and 9 into the discussion of the remaining objections.

We agree with petitioner that the GAL failed to sustain his burden of proof on objection No. 2, which alleged that petitioner abdicated its role as corporate trustee to Knox, III. We therefore conclude that the decree in appeal No. 2 should be modified by dismissing that objection. The 1957 Trust specifically provided that petitioner "may advise with counsel and shall be fully protected in respect of any action under this instrument taken, suffered or omitted in good faith by [petitioner] in accordance with the opinion of counsel." In addressing petitioner's reliance on that portion of the 1957 Trust, the Surrogate determined that petitioner was " 'inattentive to its duty, or ignored the question whether a sale of the stocks was advisable or otherwise.' " The Surrogate further determined that EPTL 11-1.7 precluded a trust from including any provision that sought to absolve a trustee for failing to act with reasonable care or diligence.

Section 11-1.7 (a) provides, in relevant part, that "[t]he attempted grant to an executor or testamentary trustee, or successor of either, . . . [of t]he exoneration . . . from liability for failure to exercise reasonable care, diligence and prudence" is contrary to public policy (EPTL 11-1.7 [a] [1]). However, "[t]he restrictions of th[at] statute do not apply to the trustee of a lifetime trust, whose grantor can set the standards, but not without 'some accountability, at least, to the settlor' " (Turano, Practice Commentaries, McKinney's

Cons Laws of NY, Book 17B, EPTL 11-1.7, at 145; *see e.g. Bauer v Bauernschmidt*, 187 AD2d 477, 478-479; *Matter of Tydings [Ricki Singer Grantor Trust]*, 32 Misc 3d 1204[A], 2011 NY Slip Op 51177[U], *6; *Matter of Kaskel*, 163 Misc 2d 203, 206-207; *Matter of Asch*, 155 Misc 2d 115, 116; *see generally* Cooper and Harper, *Exoneration Clauses - Not All They're Cracked Up To Be*, 81 NY St BJ 26 [Oct. 2009]). Although some Surrogates have begun to apply EPTL 11-1.7 to inter vivos trusts (*see e.g. Matter of Shore*, 19 Misc 3d 663, 665-666; *Matter of Francis*, 19 Misc 3d 536, 541), we decline to extend the statute beyond its clear and unambiguous terms.

In any event, that portion of the 1957 Trust permitting petitioner to seek and to rely upon the advice of counsel is not, in our view, the kind of absolute exoneration prohibited by EPTL 11-1.7. That provision does not attempt to exonerate petitioner for a "failure to exercise reasonable care, diligence and prudence" (EPTL 11-1.7 [a] [1]). Rather, it permits petitioner to consult with others provided that it acts in good faith in doing so. Indeed, prudent people, including prudent investors, often consult with other investors. Knox, III was a cotrustee on numerous other trusts involving the same family, and he had a vested interest in the success of this particular trust inasmuch as it was intended to benefit his children. Due to the special relationship that the Knox family had with petitioner, there was a level of cooperation and communication that was unique and, in our view, prudent. Petitioner was a trustee or cotrustee on numerous Knox family trusts, some of which had Knox, III as a cotrustee. Because the evidence at trial established that Knox, III was a knowledgeable and savvy investor, we conclude that petitioner acted prudently and in good faith in consulting with him and considering his advice in making investment decisions.

With respect to GAL objection No. 3, which challenges the purchase and/or retention of certain holdings, we conclude that the GAL failed to establish that petitioner acted imprudently in retaining Marine stock. In her decision and order on liability, the Surrogate concluded that all of the Marine stock should have been sold immediately upon the creation of the 1957 Trust because "it was a conflict of interest for [petitioner] to hold its own stock [when] it was the sole trustee." We agree with petitioner that the retention of Marine stock was specifically authorized by the terms of the 1957 Trust, and thus petitioner was not imprudent for retaining the Marine stock after the 1957 Trust was created.

Generally, "[t]rustee banks are not permitted to invest in their own stock or obligations or in those of any affiliates" (*Bankers Trust Co.*, 219 AD2d at 270; *see* 12 CFR 9.12 [a] [1]), and it is undisputed that petitioner's own guidelines prohibited petitioner, when acting as a corporate trustee, from investing in its own stock. Nevertheless, as noted, the retention and acquisition of Marine stock was specifically authorized by the terms of the 1957 Trust, which provided in relevant part:

"[Petitioner] is expressly authorized and empowered to retain and hold as investments in the

trust fund hereunder, for such length of time as
it shall determine in its sole discretion, any and
all stock or other securities of Marine Midland
Corporation . . . or any successor thereto . . .,
and at any time to purchase or acquire and in like
manner retain additional or other stock or
securities of said Marine Midland Corporation or
any such successor . . . *although the Marine Trust
Company of Western New York or any successor
thereto or affiliate thereof may then be acting as
Trustee hereunder*" (emphasis added).

"It is well settled that 'the trust instrument is to be construed
as written and the settlor's intention determined solely from the
unambiguous language of the instrument itself' " (*Matter of Chase
Manhattan Bank*, 6 NY3d 456, 460; *see Matter of Wallens*, 9 NY3d 117,
122; *Matter of Kettle*, 73 AD2d 786, 786) and, as noted above, " 'the
governing instrument reigns supreme' " (*David Small Trust*, 2008 NY
Slip Op 51014[U], *3).  Here, it is undisputed that the 1957 Trust
specifically authorized the retention and acquisition of Marine stock
regardless of any conflict of interest petitioner may have had as the
sole trustee.  Moreover, petitioner sought and received a legal
opinion concerning the permissibility of serving as a corporate
trustee where a significant portion of the 1957 Trust's portfolio was
made up of petitioner's own stock.  Legal counsel advised that
petitioner could do so because the concern related to the possible
conflict of interest was "expressly covered by specific authority in
the trust agreement[]."  We thus conclude that the GAL failed to
establish that petitioner acted imprudently in retaining the Marine
stock.

With respect to the Woolworth holdings, we have previously noted
that petitioner's portfolio manager conceded that the remaining
balance of the Woolworth stock should have been sold when it was
removed from petitioner's hold list in February 1997.  We conclude,
however, that the GAL established that the remaining balance of
Woolworth stock should have been sold on March 1, 1995, when the
company stopped paying any dividends.  The purpose of the 1957 Trust
was to generate income for the children of Knox, III and, until it
stopped paying dividends, the Woolworth stock was the greatest source
of income for the 1957 Trust.  Thus, when the dividends ended and the
price of the stock began to decline, there was no logical reason,
aside from the Knox family's personal connection to the company, to
retain any shares of that stock.

With respect to petitioner's decision to purchase stock in Dome
and Leesona, the GAL contended that those stocks should never have
been purchased because the companies were not on petitioner's "focus"
list as securities that could be purchased for trusts on which
petitioner was a corporate trustee.  The GAL further contended that
those stocks were purchased at the sole direction of Knox, III.  There
is no dispute that Dome and Leesona were offlist securities and that
petitioner purchased them at the direction of Knox, III, a nontrustee.
Unlike Marine and Woolworth, which were brought to the 1957 Trust by

the Grantor, Dome and Leesona were new purchases. Dome was purchased and retained from 1969 until 1987, and thus the standards of review are the common-law standard and the prudent person standard, which as previously discussed are identical. Leesona was purchased in May 1969 and sold in August 1969, and thus the standard of review is the common-law standard. As noted, both were offlist stocks and, although Dome split three times between 1969 and 1987, both stocks were sold for a loss. Ultimately, the determination whether the purchase and/or retention of those stocks was a breach of petitioner's fiduciary duty is based on whether petitioner could violate its own guidelines solely at the request of Knox, III, a nontrustee.

As noted above, the terms of the 1957 Trust gave petitioner the authority to seek advice from third parties and absolved it from liability when it acted, in good faith, upon that advice. In 1982, after the Dome stock was purchased, petitioner's Research Department advised petitioner to sell the stock. Knox, III, however, informed petitioner that "he was following the stock quite closely . . . [and did] not wish to dispose of any of the holdings at [that] time." Although both Dome and Leesona were sold for a loss, those losses, i.e., $9,690 and $4,601, respectively, were negligible.

We conclude that the GAL failed to establish that petitioner acted imprudently in considering the advice of Knox, III. As we previously noted, he was a savvy investor with a vested interest in the success of the 1957 Trust's investments. There is no evidence that Knox, III was acting against the interests of his children or that he was uneducated in financial matters. As stated above, "a fiduciary's conduct is not judged *strictly* by the success or failure of the investment . . . In short, the test is prudence, not performance, and therefore evidence of losses following the investment decision does not, by itself, establish imprudence" (*Janes*, 223 AD2d at 27 [emphasis added]). The GAL failed to establish that petitioner's consideration of the advice of Knox, III was imprudent. We thus conclude that the GAL failed to sustain his burden of proof on objection No. 3 except insofar as petitioner retained stock in Woolworth beyond March 1, 1995, and we therefore conclude that the decree in appeal No. 2 should be modified accordingly.

In GAL objection Nos. 4 and 7, the GAL contended that petitioner retained over-concentrations in investments in violation of the diversification requirements of EPTL 11-2.3 (b) (3) (C) and failed to maintain a balanced portfolio. We agree with petitioner that the Surrogate erred in sustaining those objections, and we therefore further conclude that the decree should be modified by dismissing them. In our view, although the GAL contends that there was a failure to diversify, it is apparent that the GAL is in fact objecting to overweight concentrations of particular securities and not diversification in general. A review of the account summary establishes that the 1957 Trust was indeed diversified in its investments. It held securities, cash, and bonds, and the securities were spread out over different industries. In any event, we conclude that there was no failure to diversify and that petitioner did not act imprudently in holding overweight concentrations of certain

securities.

It is undisputed that there were times throughout the existence of the 1957 Trust when various securities were held in an overweight position.  Pursuant to petitioner's guidelines, once a security reached such a position, petitioner was to divest itself of the overweight portion or document its reasons for not doing so.  At times, holding an overweight concentration of a security may be in the best interests of the beneficiaries (*see Hyde*, 44 AD3d at 1199-1200; *Kettle*, 73 AD2d at 786).  Here, there is no dispute that, for most of the period during which the 1957 Trust retained BMS, Digital, Dome, Marine and Woolworth, they were retained in overweight positions.  We conclude, however, that the GAL failed to establish that it was imprudent to do so.  With respect to Dome, the record establishes that it attained an overweight position solely because of numerous stock distributions.  In addition, that stock was retained upon the advice of Knox, III.  Although the stock was eventually sold for a loss, that loss was negligible.  All of the other stocks that were held in overweight positions increased in value.  We thus conclude that the GAL and the adult objectants, to the extent they joined in this contention, failed to meet their burden of establishing that the 1957 Trust sustained a financial loss from the retention of the securities in overweight positions.

In any event, even if the objectants had made such a showing, the mere fact that a trust might have been able to earn more money through other investments "does not establish a breach of duty which would warrant a surcharge" (*Bankers Trust Co*., 219 AD2d at 272).  The price of BMS shares did not begin to decline until 2002 and, at that point, petitioner sold some of the stock.  When the BMS stock shares declined again in 2003, petitioner divested the 1957 Trust completely of that stock.  The 1957 Trust retained the 300 shares of stock in Zimmer that had been received as a result of a BMS stock distribution.  In our view, petitioner acted prudently in retaining a well-performing stock and then acting in response to a decline.  With respect to Digital, the stock was purchased in 1975 and its value increased.  In addition, the 1957 Trust received stock distributions in Compaq as a result of holding the Digital stock.  When the value of Digital stock began to decline in 1998, petitioner sold some of the shares and by the end of 1998 had divested the 1957 Trust of all Digital stock.  With respect to both BMS and Digital, we note that there was no discussion at either the liability trial or the damages trial concerning stock distributions that provided the 1957 Trust with stock in Compaq and Zimmer.  We further note in passing that both had value and should have been included in any discussion concerning the prudence of the investments in BMS and Digital as well as in the calculation of damages.

Finally, with respect to Woolworth and Marine, the facts and circumstances of this case establish that there was no breach of fiduciary duty in retaining those stocks in overweight positions.  Because the stocks were in overweight positions when the 1957 Trust was established, the retention of those securities "may be found to be prudent even when purchase of the same securities might not" (*Hahn*, 93

AD2d at 586; *see generally Weston*, 91 NY at 508).  As indicated herein, there was a special relationship between the Knox family and both Woolworth and Marine, and Knox, III indicated a preference to retain stock in those family businesses.  Petitioner divested the 1957 Trust of all Marine stock in 1987 after the value of the stock began to decline.  During the period in which the 1957 Trust retained Marine stock, it produced over $180,000 in dividend income and over $270,000 in net increases on sales.  With respect to Woolworth, the 1957 Trust was established with 5,000 shares, and another 39 shares were purchased by petitioner.  All additional shares came into the 1957 Trust as a result of stock distributions.  While it may have been prudent to reduce the concentration, "the mere availability of other prudent courses of action that a fiduciary could have pursued does not support a finding that the fiduciary acted imprudently in choosing one such course" (*Janes*, 223 AD2d at 27).  As previously noted, the stock was the main source of income to the 1957 Trust for the entire time it was retained, generating over $515,000 in dividend income. Inasmuch as the stated purpose of the 1957 Trust was to provide for the children of Knox, III, i.e., the income beneficiaries, we conclude that petitioner acted prudently in retaining the stock in an overweight concentration.

We emphasize that, in reviewing the determinations on liability, we are guided by the underlying premise that courts must avoid reaching determinations that arrive at unreasonable or absurd results (*see East 82 v O'Gormley*, 295 AD2d 173, 174; *Stevens v Kirk*, 171 AD2d 587, 587-588; *Weisenthal v Pickman*, 153 AD2d 849, 851).  Under the facts of this case, we conclude that it would be unreasonable to hold that petitioner acted imprudently in retaining securities that, by all accounts, had appreciated or were appreciating in value and were providing significant income to the 1957 Trust.

With respect to GAL objection Nos. 5 , 6 and 8, we agree with petitioner that it kept adequate records and conclude that, while it did not record investment objectives and strategies, a review of petitioner's voluminous records establishes that it was diligent in its management of the 1957 Trust.  There was an open line of communication between petitioner and the Knox family concerning the investments made by the 1957 Trust, and all of the decisions were documented in the various exhibits.  We thus conclude that the GAL failed to establish a breach of fiduciary duties resulting from any perceived lack of record-keeping or documentation.

Insofar as GAL objection No. 5 includes a general allegation that petitioner failed to manage the trust with care, skill and prudence, we conclude that this objection should be sustained only insofar as petitioner acted imprudently in failing to divest the 1957 Trust of all Woolworth stock on March 1, 1995 when it ceased paying dividends. We therefore conclude that the decree in appeal No. 2 should be modified accordingly with respect to objection Nos. 5, 6 and 8.

In objection No. 10, the GAL challenges inaccuracies in one of the accounting schedules.  There was no proof establishing such inaccuracies at the liability trial and thus, to the extent the

Surrogate sustained that objection when she sustained "all" of the objections, we conclude that the Surrogate erred.  We thus further conclude that the decree in appeal No. 2 should be modified by dismissing that objection.

VIII

With respect to the damages phase of the trial, we reject petitioner's contention that the Surrogate abused or improvidently exercised her discretion in permitting the objectants' expert to testify as an "expert."

> "[T]he qualification of a witness to testify as an expert is a matter that rests in the discretion of the trial court, 'subject to review only if the Judge has made a serious mistake, committed an error of law or abused the discretion' . . . Once the expert is deemed qualified, the 'extent of an expert's qualification is a fact to be considered by the trier of the fact when weighing the expert testimony' " (*Matter of Pringle v Pringle*, 296 AD2d 828, 829; *see Werner v Sun Oil Co.*, 65 NY2d 839, 840).

Objectants' expert had work experience managing "hundreds of trust accounts" as well as three common trust funds, and he completed annual performance evaluations of those common trust funds.  As an arbitrator for "FINRA" and "NASD," he completed damage calculations related to trusts.  Those calculations involved consideration of returns on various portfolios.  In comparison, petitioner's expert was a "distinguished university professor" of finance and statistics with a Ph.D. in finance, economics and econometrics.  He was the managing editor of the Journal of Financial Economics, and had published numerous articles on the valuation of securities and the stock market. He had testified as an expert witness approximately 10 times, but had consulted on many additional cases involving the computation of damages under the lost capital methodology.

Based on our resolution of the Surrogate's determination of liability, we need not address petitioner's remaining contentions concerning the damages award.  Inasmuch as we are remitting this matter to Surrogate's Court for a recalculation of the amount of surcharges, however, we note that the Surrogate erred in adopting, in total, the calculations made by objectants' expert.  The experts for both parties concluded that the damages, if any, should be calculated using the lost capital methodology.  Although we are not deciding the issue whether the lost capital methodology is the correct measure of damages where, as here, the securities that allegedly should have been sold were appreciating in value, we nevertheless agree with petitioner that objectants' expert erred in failing to follow the formula established by the Court of Appeals in *Janes* (90 NY2d at 55). Objectants' expert failed to apply an interest rate that was compounded annually on the dividends and failed to account for capital gains taxes to the hypothetical sales of stock.

>"Where . . . a fiduciary's [alleged] imprudence
>consists solely of negligent retention of assets
>it should have sold, the measure of damages is the
>value of the lost capital . . . In imposing
>liability upon a fiduciary on the basis of the
>capital lost, the [Surrogate] should determine the
>value of the stock on the date it should have been
>sold, and subtract from that figure the proceeds
>from the sale of the stock or, if the stock is
>still retained by the estate, the value of the
>stock at the time of the accounting . . . Whether
>interest is awarded, and at what rate, is a matter
>within the discretion of the [Surrogate] . . .
>Dividends and other income attributable to the
>retained assets should offset any interest
>awarded" (*Janes*, 90 NY2d at 55; *see Janes*, 223
>AD2d at 34-35; *see also Matter of Garvin*, 256 NY
>518, 521; *Hunter*, 2010 NY Slip Op 50548[U], *14).

Petitioner correctly contends that "[p]er diem interest [at the appropriate rate] shall be calculated each year on the rolling balance as adjusted for each dividend received and the proceeds from each sale of stock. The total annual per diem interest shall be added to the rolling balance at the end of each calendar year which shall then constitute the base for calculating per diem interest for the ensuing year" (*Hunter*, 2010 NY Slip Op 50548[U], *14). Although it is not apparent from the reported decision in *Janes*, the GAL stipulated that "the expert in *Janes* applied an interest rate to dividends for purpose of his calculation." Petitioner's expert, who had testified or consulted in other reported cases (*see e.g. Saxton*, 274 AD2d 110; *Matter of Dumont*, 4 Misc 3d 1003[A], 2004 NY Slip Op 50647[U], *23, *revd on other grounds sub nom. Chase Manhattan Bank*, 26 AD3d 824; *Hunter*, 2010 NY Slip Op 50548[U]), testified that interest had been applied to dividends by experts for both the petitioners and the objectants in those other cases. We thus conclude that the Surrogate erred in failing to apply compound interest to dividends.

We further conclude that the Surrogate erred in failing to account for capital gains taxes.

>"Fiduciaries argue that if the concentrated
>position had appreciated in value, then the trust
>would have paid a capital gains tax if this
>position was sold. Therefore, the trust would
>have kept only the net proceeds. Second, to argue
>that 'accounting for a potential capital gains tax
>would result in the double taxation of damages' is
>inapposite because a trustee is likely to make
>several purchases and sales of securities held in
>the trust account during the course of
>administration. Consequently, the same proceeds
>in a long-term trust could be subject to a capital
>gains tax on several occasions as long as the
>assets are consistently appreciating in value"

(Radigan, *Rulings on Trustee's Duty to Diversify:
What Have We Learned?*, NYLJ, Sept. 12, 2011, at 3,
col 1; *see e.g. Garvin*, 256 NY at 521; *Saxton*, 274
AD2d at 120-121; *Hunter*, 2010 NY Slip Op 50548[U],
*14).

It must be remembered that the purpose of damages is to replace
capital that has been lost by the trust, not by the beneficiaries (*see
Saxton*, 274 AD2d at 121; *Matter of Lasdon*, 32 Misc 3d 1245[A], 2011 NY
Slip Op 51710[U], *2).

Finally, we note that the decision to award interest and, if so,
the rate at which to award it are matters that are generally left to
the discretion of the Surrogate (*see Janes*, 90 NY2d at 55). Although
we perceive no abuse of discretion in the determination to award
interest, we conclude that the Surrogate erred in applying a 9%
interest rate to damages occurring before June 1981. New York adopted
a 6% statutory interest rate in 1972 (L 1972, ch 358). Effective June
15, 1981, the statute was amended to increase the rate of interest to
9% (*see* CPLR 5004; L 1981, ch 258). We conclude that the Surrogate
should have used a 6% interest rate to any damages occurring before
June 15, 1981. In any event, because we conclude that the only
breaches that occurred were after 1981, the issue of the interest rate
is rendered moot.

IX

Finally, petitioner contends that the Surrogate abused her
discretion in awarding fees and expenses payable by petitioner to the
GAL and to the attorney for the adult objectants. We agree, and
therefore conclude that the decree in appeal No. 2 should be further
modified by vacating those awards. As the Surrogate recognized, the
fee to be awarded to the GAL is governed by SCPA 405 (1), which
provides in relevant part that a guardian ad litem is entitled to
"reasonable compensation . . . payable from any or all of the
following, in such proportion as directed by the [Surrogate] . . . (a)
the estate, (b) the interest of the person under disability, or (c)
for good cause shown, any other party." Generally, "the guardian's
compensation is charged against the estate because his or her
appointment is jurisdictional and the finality of a decree inures to
the benefit of all persons interested in the estate" (*Matter of
Greene*, 20 Misc 3d 599, 604; *see Matter of DeAngelis*, 14 Misc 3d
1236[A], 2007 NY Slip Op 50335[U], *2). SCPA 405 was amended in 1993
to add the provision permitting the Surrogate, for good cause shown,
to order a party to pay the guardian ad litem's fees (L 1993, ch 514,
§ 8). "Since the amendment was specifically designed to bring
uniformity to the civil courts, the Surrogate's Court, in interpreting
such new statute, should follow the precedents in the decisions
construing CPLR 1204. Those cases hold that a party may be charged
with payment of the compensation of a guardian ad litem only where the
actions of such party generated unnecessary, unfounded or purely
self-serving litigation that resulted in the appointment of a
guardian" (*Matter of Ault*, 164 Misc 2d 272, 274; *see generally Matter
of Board of Educ. of Northport-E. Northport Union Free School Dist. v

*Ambach*, 90 AD2d 227, 242-243, *affd* 60 NY2d 758, *cert denied* 465 US 1101).  Inasmuch as this proceeding was an accounting procedure mandated by statute (*see* SCPA 2211 [1]), there is no evidence that petitioner generated unnecessary, unfounded or purely self-serving litigation and, therefore, should not be held liable for compensating the GAL.

With respect to the award to the attorney for the adult objectants, "it is well settled that a Surrogate has the discretion to order a fiduciary to pay [attorneys'] fees" (*Matter of Manufacturers & Traders Trust Co. [Adams]*, 72 AD3d 1573, 1574; *see generally Garvin*, 256 NY at 521-522), but such fees generally are not awarded "where there is no agreement, statute or rule providing for such fees and where the losing party has not acted maliciously or in bad faith" (*Saxton*, 274 AD2d at 121; *cf. Matter of Rose BB.*, 16 AD3d 801, 803; *Kettle*, 73 AD2d at 787).  Inasmuch as the Surrogate found "no evidence of malevolence, dishonesty, or other malfeasance on the part of [petitioner]," we conclude that it was an abuse of discretion to order petitioner to pay attorneys' fees and expenses to the attorney for the adult objectants.

X

Accordingly, we conclude that the decree in appeal No. 2 should be modified pursuant to our decision herein, and that the remaining appeals should be dismissed.

Entered:  June 19, 2012                        Frances E. Cafarell
                                               Clerk of the Court