# SUPREME COURT OF THE STATE OF NEW YORK
## *Appellate Division, Fourth Judicial Department*

**987**

**CA 14-01754**

PRESENT: CENTRA, J.P., PERADOTTO, LINDLEY, WHALEN, AND DEJOSEPH, JJ.

---

IN THE MATTER OF JP MORGAN CHASE BANK, N.A. (SUCCESSOR BY MERGER TO THE CHASE MANHATTAN BANK) (SUCCESSOR BY MERGER TO CHASE LINCOLN FIRST BANK, N.A.) (SUCCESSOR IN INTEREST TO LINCOLN FIRST BANK, N.A.) (SUCCESSOR BY CONSOLIDATION TO LINCOLN FIRST BANK OF ROCHESTER) (FORMERLY KNOWN AS LINCOLN ROCHESTER TRUST COMPANY), AS TRUSTEE UNDER THE TRUST AGREEMENT DATED MAY 23, 1932 BY ALVAH G. STRONG, DECEASED AND PURSUANT TO THE EXERCISE OF THE POWER OF APPOINTMENT UNDER PARAGRAPH NINTH OF THE WILL OF MARJORIE H. STRONG, DECEASED, FOR THE BENEFIT OF MARJORIE STRONG WEHLE, DECEASED (WHO DIED JANUARY 8, 2004), PETITIONER-APPELLANT-RESPONDENT. (PROCEEDING NO. 1.)

MEMORANDUM AND ORDER

---------------------------------------------------------

IN THE MATTER OF JP MORGAN CHASE BANK, N.A. (SUCCESSOR BY MERGER TO THE CHASE MANHATTAN BANK) (SUCCESSOR BY MERGER TO CHASE LINCOLN FIRST BANK, N.A.) (SUCCESSOR IN INTEREST TO LINCOLN FIRST BANK, N.A.) (SUCCESSOR BY CONSOLIDATION TO LINCOLN FIRST BANK OF ROCHESTER) (FORMERLY KNOWN AS LINCOLN ROCHESTER TRUST COMPANY), AS TRUSTEE UNDER PARAGRAPH 22(b)(4) OF THE WILL OF ALVAH G. STRONG, DECEASED, FOR THE BENEFIT OF MARJORIE STRONG WEHLE, DECEASED (WHO DIED JANUARY 8, 2004), PETITIONER-APPELLANT-RESPONDENT. (PROCEEDING NO. 2.)

---------------------------------------------------------

IN THE MATTER OF JP MORGAN CHASE BANK, N.A. (SUCCESSOR BY MERGER TO THE CHASE MANHATTAN BANK) (SUCCESSOR BY MERGER TO CHASE LINCOLN FIRST BANK, N.A.) (SUCCESSOR IN INTEREST TO LINCOLN FIRST BANK, N.A.) (SUCCESSOR BY CONSOLIDATION TO LINCOLN FIRST BANK OF ROCHESTER) (FORMERLY KNOWN AS LINCOLN ROCHESTER TRUST COMPANY), AS TRUSTEE UNDER PARAGRAPH FOURTH OF THE WILL OF ALVAH G. STRONG, DECEASED, FOR THE BENEFIT OF MARJORIE STRONG WEHLE, DECEASED (WHO DIED JANUARY 8, 2004), PETITIONER-APPELLANT-RESPONDENT. (PROCEEDING NO. 3.)

---------------------------------------------------------

IN THE MATTER OF JP MORGAN CHASE BANK, N.A. (SUCCESSOR BY MERGER TO THE CHASE MANHATTAN

BANK) (SUCCESSOR BY MERGER TO CHASE LINCOLN
FIRST BANK, N.A.) (SUCCESSOR IN INTEREST TO
LINCOLN FIRST BANK, N.A.) (SUCCESSOR BY
CONSOLIDATION TO LINCOLN FIRST BANK OF ROCHESTER)
(FORMERLY KNOWN AS LINCOLN ROCHESTER TRUST
COMPANY), AS TRUSTEE UNDER PARAGRAPH TENTH OF
THE WILL OF MARJORIE H. STRONG, DECEASED, FOR
THE BENEFIT OF MARJORIE STRONG WEHLE, DECEASED
(WHO DIED JANUARY 8, 2004),
PETITIONER-APPELLANT-RESPONDENT.
(PROCEEDING NO. 4.)
-----------------------------------------------------
CHARLES WEHLE AND HENRY WEHLE,
OBJECTANTS-RESPONDENTS-APPELLANTS.
(APPEAL NO. 4.)

---

HARRIS BEACH PLLC, PITTSFORD (A. VINCENT BUZARD OF COUNSEL), FOR
PETITIONER-APPELLANT-RESPONDENT.

HARRIS, WILTSHIRE & GRANNIS LLP, WASHINGTON, D.C. (MARK A. GRANNIS OF
COUNSEL), FOR OBJECTANTS-RESPONDENTS-APPELLANTS.

---

Appeal and cross appeal from a judgment of the Surrogate's Court,
Monroe County (Edmund A. Calvaruso, S.), entered April 21, 2014.  The
judgment, inter alia, granted objectants money damages of
$3,711,262.55.

It is hereby ORDERED that the judgment so appealed from is
unanimously modified on the law by dismissing the objections to the
petitions seeking judicial settlement of the accounts of Trust I,
Trust II, and Trust III and vacating the third through sixth decretal
paragraphs and as modified the judgment is affirmed without costs.

Memorandum:  Petitioner-appellant-respondent (petitioner) served
as trustee for, inter alia, three trusts that were established for the
benefit of Marjorie Strong Wehle.  Trust I was funded on August 2,
1976 with 15,430 shares of Kodak stock.  The stock originally was
placed in trust by Henry Alvah Strong, who was one of George Eastman's
original partners and who served as Kodak's first president, for the
benefit of his grandson, Alvah G. Strong.  Alvah Strong assigned his
remainder interest to an inter vivos trust he established in 1932 for
the benefit of his wife, Marjorie H. Strong.  In her will, Marjorie
Strong directed that the principal of the trust be divided into three
trusts for the benefit of her daughters, one of whom was Wehle, with a
remainder interest for their respective issue, per stirpes.  Trust I
received additional shares of Kodak stock from two stock splits and
from the estate of Alvah Strong's father, Henry Griffin Strong.  Trust
II was created in 1966 in the will of Alvah Strong for the benefit of
his wife, and he directed that, at his wife's death, the remaining
principal be placed into trusts for each of their three daughters,
including Wehle, with a remainder interest to their respective issue,
per stirpes.  It was funded with 5,668 shares of Kodak stock.  Trust

III also was created in Alvah Strong's will, for Wehle's benefit, with a remainder interest for her issue, per stirpes.  It was funded with 1,000 shares of Kodak stock.

It is undisputed that petitioner had sole investment authority over the three trusts and that none of the trusts provided for any restrictions regarding investment decisions (*cf. Matter of Chase Manhattan Bank*, 26 AD3d 824, 825-826, *lv denied* 7 NY3d 824, *rearg denied* 7 NY3d 922).  The three trusts were entirely divested of Kodak stock by January 2002.  Petitioner sold 8,400 shares held in Trust I between June 1993 and January 1998, 16,199 shares between May 1999 and April 2000, and the remaining 2,000 shares in January 2002.  Petitioner completely divested Trust II of Kodak stock in two sales that occurred in 1978 and 1979, respectively.  Petitioner sold small amounts of the Kodak stock held in Trust III between January 1968 and July 1972, approximately one-half of the remaining shares in February 1977, and the balance of the shares in January 1979.

Following Wehle's death in 2004, petitioner filed petitions on June 26, 2006, seeking judicial settlement of the accounts of the three trusts.  The respective petitions alleged that Trust I had a gross value of assets, including principal and income, totaling more than $4.5 million, that Trust II had a gross value of assets totaling more than $3 million, and that Trust III had a gross value of assets totaling more than $718,000.

Objectants-respondents-appellants (objectants), Wehle's two surviving sons, filed objections to each account, alleging with respect to each account, inter alia, that petitioner had failed to prudently invest trust assets, including failing to adequately diversify the investment portfolios; that petitioner failed to exercise reasonable diligence, care, and skill in the management and administration of the respective trusts; that petitioner failed and neglected to establish investment objectives for the respective trusts and to formulate strategies to accomplish those objectives; and that petitioner failed to communicate with the beneficiaries with respect to management of the trust and the risk of maintaining a concentration of Kodak stock.  Objectants sought compensatory damages, a return of petitioner's commissions, and legal fees.

Following a nonjury trial, Surrogate's Court determined, inter alia, that petitioner was negligent in its management of the three trusts, particularly with respect to its failure to diversify and divest the trusts of a concentration of Kodak stock.  The Surrogate determined that petitioner should have sold 95% of the Kodak stock held in each trust within 30 days of the receipt of the stock, i.e., by September 1, 1976 and July 4, 1987 with respect to Trust I; by August 20, 1976 with respect to Trust II; and by August 19, 1966 with respect to Trust III.  The Surrogate employed the lost capital method set forth in *Matter of Janes* (90 NY2d 41, 55, *rearg denied* 90 NY2d 885) to calculate the damages.  Specifically, he determined the value of the stock on the date on which he determined that it should have been sold and subtracted from that figure the proceeds from the sale of the stock.  He then added compound interest at the statutory rate

from the date he determined that the stock should have been sold, i.e., six percent before June 15, 1981 and nine percent thereafter, and offset that amount by the amount paid to Wehle in dividends, with compound interest (*see id.; see also Matter of HSBC Bank USA, N.A. [Knox]*, 98 AD3d 300, 320-321). The Surrogate determined that there were no damages as a result of petitioner's management of Trust I, noting that the stock held in Trust I came from the time of Kodak's inception and had not received a step-up in the tax basis in over 80 years, which would have reduced the amount of capital gains tax liability. The Surrogate therefore determined that, at the two dates on which he determined that the stock should have been sold, inasmuch as the hypothetical sale would have resulted in the payment of significant capital gains taxes, there was a net loss of zero dollars. With respect to Trust II and Trust III, collectively, the Surrogate determined that the surcharge amount to be imposed against petitioner was $3,069,644, plus compound interest. He further determined that petitioner's commissions were to be added to the surcharge amount, with prejudgment compound interest applied at the statutory rate to the commissions. We conclude that the Surrogate erred in his determination that petitioner was negligent in the management of the three trusts and, consequently, in imposing surcharges, and we therefore modify the judgment by dismissing the objections to the accounts of each of the three trusts.

As a preliminary matter, we agree with petitioner that the Surrogate abused his discretion by directing it to forfeit its commissions and by awarding prejudgment interest on those commissions. Trustees "shall be entitled" to annual commissions (SCPA 2309 [2]; 2312 [2], [4] [a]) where, as here, the Surrogate "made no finding of bad faith, fraud or personal enrichment" against petitioner (*Matter of Blodgett*, 261 App Div 878, 878, *affd* 286 NY 602). Indeed, the Surrogate rejected the objectants' claim that petitioner acted in its own self-interest or was disloyal to the beneficiaries (*see Matter of Lasdon*, 105 AD3d 499, 500, *lv denied* 22 NY3d 856). Contrary to objectants' contention, our decision in *Matter of Janes* (223 AD2d 20, *affd* 90 NY2d 41, *rearg denied* 90 NY2d 885), does not support the forfeiture of commissions. In that case, we concluded that the trustee "exhibited total indifference" to a "prolonged and steep decline" in the price of the stock and then misled the beneficiary for several years to conceal the loss (*id*. at 32). We denied petitioner commissions based upon its "nondisclosure, concealment, and misrepresentation" (*id*.), none of which is present here. Although "[t]rustees can be denied commission 'where their acts involve bad faith, a complete indifference to their fiduciary obligations or some other act that constitutes malfeasance or significant misfeasance' . . . [,] [t]he denial of a commission . . . should not be 'in the nature of an additional penalty' " (*Matter of Gregory Stewart Trust*, 109 AD3d 755, 757). We conclude that, inasmuch as there is no evidence of malfeasance or significant misfeasance here, the Surrogate's award to objectants of petitioner's commissions constitutes an additional penalty to petitioner. We note that, although there may be rare cases in which prejudgment interest on commissions may be appropriate (*see generally Beard v Beard*, 140 NY 260, 265-266), this is not such a case

and, thus, the Surrogate also abused his discretion in awarding prejudgment interest.

" 'In reviewing a determination made after a nonjury trial, the power of this Court is as broad as that of [Surrogate's Court], and we may render a judgment we find warranted by the facts, bearing in mind that in a close case, the [Surrogate] had the advantage of seeing the witnesses' " (*Matter of Hunter*, 100 AD3d 996, 997-998, *lv dismissed* 21 NY3d 1037, *lv denied* 22 NY3d 860). We conclude that the Surrogate erred in sustaining the objections to the three accounts because objectants failed to sustain their burden of proving that petitioner failed to diversify the trusts prudently within a reasonable time, and also failed to establish a reasonable date from which a surcharge could be calculated. As we explained in *Knox* (98 AD3d at 308-309), petitioner was subject to three separate standards of care as trustee: "[f]rom [1966] until 1970, the standard was the common-law rule, which provided that 'the trustee is bound to employ such diligence and such prudence in the care and management, as in general, prudent [persons] of discretion and intelligence in such matters, employ in their own like affairs' . . . From 1970 to 1995, the standard of care was the prudent person rule established in EPTL 11-2.2 (a) (1), which provided that '[a] fiduciary holding funds for investment may invest the same in such securities as would be acquired by prudent [persons] of discretion and intelligence in such matters who are seeking a reasonable income and preservation of their capital' . . . Effective, January 1, 1995, the Prudent Investor Act (EPTL 11-2.3 [L 1994, ch 609, § 1]) created a new standard of care by providing that '[a] trustee shall exercise reasonable care, skill and caution to make and implement investment and management decisions as a prudent investor would for the entire portfolio, taking into account the purposes and terms and provisions of the governing instrument' (EPTL 11-2.3 [b] [2]). The statute lists various elements of the prudent investor standard, including: pursuing an overall investment strategy; considering numerous factors pertaining to the overall portfolio including, e.g., general economic conditions; and diversifying assets (*see* EPTL 11-2.3 [b] [3] [A]-[C])." Notably, the "Prudent Investor Act requires a trustee 'to diversify assets unless the trustee reasonably determines that it is in the interests of the beneficiaries not to diversify' " (*Janes*, 90 NY2d at 49 n, quoting EPTL 11-2.3 [b] [3] [C]; *see Knox*, 98 AD3d at 310).

Petitioner's performance with respect to the three trusts is assessed under the above standards of care; i.e., Trust I is assessed by the guidelines contained in the prudent person rule and the Prudent Investor Act; Trust II is assessed by the guidelines contained in the prudent person rule; and Trust III is assessed by the common-law rule and the prudent person rule. Under each of the standards, however, "[i]n order to warrant a surcharge, 'the objectant[s] must show that a financial loss resulted from the trustee's negligence or failure' to act prudently" (*Knox*, 98 AD3d at 310-311; *see Matter of Donner*, 82 NY2d 574, 585). Furthermore, "[u]nder all three standards, 'it is not sufficient that hindsight might suggest that another course would have been more beneficial; nor does a mere error of investment judgment mandate a surcharge' " (*Knox*, 98 AD3d at 309). "Whether a surcharge

should be imposed . . . depends on 'a balanced and perceptive analysis of [petitioner's] consideration and action in the light of the history of each individual investment, viewed at the time of its action or its omission to act' " (*Donner*, 82 NY2d at 585).

With respect to Trust I, we conclude that the court erred in sua sponte determining that petitioner was negligent in failing to dispose of 95% of the stock within 30 days of receipt, i.e., by September 1, 1976 and by July 4, 1987, dates which were neither pleaded nor proved by objectants (*see Chase Manhattan Bank*, 26 AD3d at 828). Objectants presented the testimony of a former portfolio manager, who explained that, in 1976, Kodak was considered a "top-quality stock" and that the sale of the stock in Trust I would have resulted in significant capital gains taxes because of the 81 cents per share cost basis of the stock held in that trust. Petitioner's gradual divestiture of the Kodak stock in 14 sales, each of which involved 250 to 2000 shares, between the years 1977 and 1993, satisfied the requirements of the prudent person rule inasmuch as the gradual sale of the Kodak stock in order to reduce the capital gains tax liability preserved the principal of the trust and the income paid to Wehle, both of which would have been reduced if the stock had been sold within 30 days of receipt (*see* EPTL 11-2.2 [a] [1]). Indeed, "it is well established 'that retention of securities received from the creator of the trust may be found to be prudent even when purchase of the same securities might not' " (*Knox*, 98 AD3d at 309). "[T]he very nature of the prudent person standard dictates against any absolute rule that a fiduciary's failure to diversify, in and of itself, constitutes imprudence" (*Janes*, 90 NY2d at 50). The record supports our conclusion that, in light of the tax implications of the sale of the stock and the fact that the concentration of the stock in Trust I provided significant income, "it would be unreasonable to hold that petitioner acted imprudently in retaining securities that . . . had appreciated or were appreciating in value and were providing significant income to [Trust I]" (*Knox*, 98 AD3d at 318). Indeed, the objectants neither alleged nor offered proof that a compelling reason for the sale of the Kodak stock other than diversification existed on either September 1, 1976 or July 4, 1987. Instead, the record establishes that the value of the stock continued to rise after 1993 until 1998, at which time petitioner divested Trust I of all but 2000 shares over a two-year period, thereby eliminating a concentration of Kodak shares from Trust I. Petitioner's expert explained that the trust made a cumulative profit of $2,856,763 from the sale of the Kodak stock, and that if the Kodak stock had been sold within 30 days of its receipt, the investable base of principal would have been nearly halved by taxes.

We further conclude that petitioner did not violate the Prudent Investor Act from 1995 to 1998 because it "reasonably determine[d] that it [was] in the interests of the beneficiaries not to diversify" (EPTL 11-2.3 [b] [3] [C]). The Valueline rating for safety from December 1994 through June 1997 was 2, on a scale of 1 to 5, with 1 being the highest rating, and the value of the stock rose steadily from December 1994 through September 1998. The safety rating dropped to 3 in September 1997, where it remained until it again rose to 2 in

September 2000.  Petitioner divested Trust I of Kodak stock with eight sales during the period beginning in January 1998 through April 2000 with a gain in excess of $1.4 million.  We also conclude that petitioner complied with the Prudent Investor Act from 1998 through 2000 by diversifying the remaining concentration of Kodak stock, with the exercise of "reasonable care, skill and caution" (EPTL 11-2.3 [b][2]), "in light of facts and circumstances prevailing at the time" (EPTL 11-2.3 [b] [1]).

With respect to Trust II, which we analyze under the prudent person rule, we likewise conclude that the Surrogate erred in sua sponte determining that petitioner should have divested the trust of a concentration of Kodak stock within 30 days, inasmuch as that determination improperly constitutes an "absolute rule that a fiduciary's failure to diversify, in and of itself, constitutes imprudence" (*Janes*, 90 NY2d at 50).  We further conclude that objectants failed to meet their burden of establishing that the three-year period over which petitioner diversified the portfolio was in any way a violation of its duty to hold and invest securities as would a prudent person "of discretion and intelligence in such matters who are seeking a reasonable income and preservation of their capital" (EPTL 11-2.2 [a] [1]).  In engaging in "a balanced and perceptive analysis of [petitioner's] consideration and action in light of the history of each individual investment, viewed at the time of its action or its omission to act [,] . . . [and viewing] [petitioner's] conduct over *the entire course of the investment*," (*Janes*, 90 NY2d at 50 [internal quotation marks omitted]), we conclude that petitioner acted prudently with respect to Trust II.  We therefore conclude that the Surrogate erred in imposing a surcharge with respect to that trust.

We conclude with respect to Trust III that the Surrogate erred in determining that 95% of the stock should have been sold within 30 days, i.e., by August 19, 1966, inasmuch as that date was arbitrary, not supported by the record or, indeed, pleaded by objectants (*see Chase Manhattan Bank*, 26 AD3d at 828).  At the time the trust was funded and until 1970, petitioner was obligated "to employ such diligence and such prudence in the care and management, as in general, prudent [persons] of discretion and intelligence in such matters, employ in their own like affairs" (*King v Talbot*, 40 NY 76, 85-86; *see Knox*, 98 AD3d at 308).  From 1970 until the stock was sold in two sales in 1978 and 1979, petitioner was obligated to comply with the prudent person rule.  Although petitioner stipulated that it could not determine who managed Trust III between 1966 and 1975 and that it did not have annual review forms for that period, objectants nevertheless failed to establish that any loss was caused by such failure (*see generally Matter of Hahn*, 93 AD2d 583, 587-588, *affd* 62 NY2d 821; *Knox*, 98 AD3d at 311).  The record establishes that the Kodak stock significantly outperformed the Standard & Poor's 500 Index during the entire period it was held in Trust III.  "Under the facts of this case, we conclude that it would be unreasonable to hold that petitioner acted imprudently in retaining securities that, by all accounts, had appreciated or were appreciating in value and were providing significant income to [Trust III]" (*Knox*, 98 AD3d at 318). We therefore conclude that the Surrogate erred in assessing a

surcharge with respect to Trust III.

In light of our determination, we do not address the contention raised by objectants on their cross appeal.