Matter of Weber (2024 NY Slip Op 24258)

[*1]

Matter of Weber

2024 NY Slip Op 24258

Decided on October 10, 2024

Surrogate's Court, Saratoga County

Schopf, S.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on October 10, 2024
Surrogate's Court, Saratoga County

In the Matter of the Accounting by Susan F. Weber as the Trustee of the Michael S. Weber Trust 
 for the benefit of Owen K. Weber under Article SEVENTH of the Last Will and Testament 
 of Michael S. Weber, Decedent.

File No. 1845-4/B

Jennifer M. Boll, Esq.
Mara D. Afzali, Esq.
Bond, Schoeneck & King, LLP
Attorneys for the Petitioner
22 Corporate Woods Boulevard, Suite 501
Albany, NY 12211
Carl W. Hasselbarth, Esq.
Attorney for Objectant
PO Box 16
Clifton Park, New York 12065

Jonathan G. Schopf, S.

MICHAEL S. WEBER (hereinafter the "Decedent") died a resident of Saratoga County on December 7, 2003, leaving a Last Will and Testament, dated January 22, 1999, and First Codicil to the Last Will and Testament of Michael S. Weber, dated September 7, 2000 (the "Will"). Petitioner and Decedent's sister, Susan Weber, was named and qualified as the Executrix of the Estate and as Trustee of a certain Trust for the benefit of Objectant—Decedent's son and Petitioner's nephew, Owen K. Weber. Thereafter, Petitioner acted in her capacity as Executrix of the Estate as well as Trustee of the Trust for the benefit of Objectant, and now seeks to account. 
Petitioner filed a Petition for Judicial Settlement of the Interim Account of the Trustee on June 17, 2022, with attachments thereto. Objectant responded by filing objections to the Trust Account on August 18, 2022, alleging, in relevant part, that Petitioner breached her fiduciary duty as Trustee with respect to her retention and use of real property located in Cat Island, the Bahamas (the "Cat Island Property") that was received by the trust in-kind from Decedent's estate (the "Estate"). Petitioner filed a supplemental accounting of the Trust ("Supplemental Trust Account"), with schedules attached thereto on June 6, 2023, and an Amended Petition on June 22, 2023. On December 11, 2023, the Petitioner was deposed. 
Objectant filed a motion for summary judgment on January 30, 2024, which Petitioner [*2]opposed on February 29, 2024. By Decision and Order dated March 27, 2024, Objectant's motion was denied. A hearing was then held on May 8, 2024, May 22, 2024, and June 7, 2024. The Court received voluminous exhibits from both sides [FN1]
, as well as having marked eight (8) Court Exhibits consisting of the original Will and Codicil and supporting affidavits, the accounting at issue, the pleadings and the final decree in the underlying estate.
Prior to the hearing, Objectant submitted a letter request for a bifurcation of the hearing between liability and damages. This issue was discussed on the record prior to commencing the first day's testimony and the request was denied for the reasons stated on the record and pursuant to Matter of Wellington Trusts, 41 Misc 3d 1221(A) [Surrogate's Court Nassau County 2013].
Post-Hearing proposed findings of fact and conclusions of law were submitted by both Petitioner and Objectant on August 1, 2024. The Court now issues this Decree settling the account.
Scope of the Hearing
The primary issues adjudicated at the hearing and addressed herein include: (A) whether Objectant established that Petitioner breached her fiduciary duty by retaining the Cat Island Property as a Trust asset, in violation of the Prudent Investor Act; (B) whether Objectant established that Petitioner breached her fiduciary duty by traveling to the Cat Island Property during her time as Trustee and whether such travel to the Cat Island Property amounted to a conflict of interest or self-dealing; and (C) whether Objectant suffered damages resulting from Petitioner's alleged breaches of fiduciary duty. All other issues are collateral to those mentioned above.
Discussion
At the outset of the hearing, the parties stipulated that Petitioner met her prima facie burden of establishing that the Trust is fully and accurately accounted for, as reflected in the Trust Account. The burden of proof now shifts to Objectant to overcome the prima facie accuracy of the Interim Account and prove his objections (see Matter of Cook, 177 AD3d 1214 [App. Div. 3rd Dept]; see also Rudin v. Heimlich, 34 AD3d 371 [App. Div. 1st Dept]).
I. Breach of Fiduciary Duty in Retention of Cat Island Property
As an initial matter, the Court addresses Objectant's argument that Petitioner is a trustee with "special investment skills" pursuant to EPTL § 11-2.3(b)(6), thereby subjecting her to a heightened standard of care when analyzing the breach of fiduciary duty claims.
To establish that the heightened standard of care applies, Objectant must prove that Petitioner is either a "paid professional investment advisor (whether or not registered under any federal securities or investment law)" or that she otherwise "represent[ed] that [she] has special investment skills . . . ." (EPTL § 11-2.3(b)(6); see also In re Est. of Witherill, 37 AD3d 879, 880 [3d Dep't 2007] [applying heightened standard of care to attorney only where trustee was no longer serving as an attorney and had separately held himself out as a "skilled financial advisor [*3]and was paid handsomely for such services during decedent's lifetime"]).
At the hearing, it was adduced that Petitioner was never a trust attorney or worked in the investment services field, nor did she hold herself out to possess such specialized skills. In fact, Objectant's own expert witness, Charles Ranson, testified that it was his uncontradicted opinion that Petitioner was "a lay trustee."[FN2]

The Court finds that Petitioner is, and was, a lay trustee from her inception as Trustee and for the entire period covered by the instant Interim Account and owed Objectant a fiduciary duty as such. 
To establish a claim for breach of fiduciary duty against a lay trustee, Objectant holds the burden to prove: (1) the existence of a fiduciary duty by Petitioner, (2) misconduct by Petitioner, and (3) damages directly resulting from Petitioner's misconduct (see, Massey-Hughes v. Massey, 200 AD3d 1684, 1687 [4th Dep't 2021]).
The first element having already been met and addressed in the affirmative; the Court must now analyze the second element of misconduct. More specifically, Objectant's allegations (1) that the protections afforded by the so-called "retained asset standard" do not apply to the analysis of whether Petitioner acted prudently in retaining the Cat Island Property; (2) the date on which Objectant maintains Petitioner should have sold the Cat Island Property; and (3) whether Petitioner's decision to travel to the Cat Island Property influenced improperly her decision to retain it.
Regarding the so-called "retained asset standard", courts have clarified that a trustee's decision to retain property received in-kind to a trust should be afforded more leniency than a trustee's decision to purchase a new investment (see In re JP Morgan Chase Bank, NA., 133 AD3d 1292 [4th Dep't 2015] ["Indeed, it is well established that retention of securities received from the creator of the trust may be found to be prudent even when purchase of the same securities might not." [internal quotation marks and citation omitted]).
The Objectant's position is that the retained asset standard does not apply because the Trust's retention and use of the Cat Island Property was "imprudent on its face" and that Petitioner relied on sentimental reasons in its retention. Although Petitioner admitted that she retained the Cat Island Property, at least in part, due to sentimental reasons, that does not end the analysis. The Objectant needs to prove that the retention and use was misconduct and that such misconduct resulted in damages to the Trust and/or its beneficiary. In his post-hearing submission, the Objectant does not cite to any caselaw or evidentiary facts to support his contention that the retention of the Cat Island Property was "imprudent on its face." For the reasons discussed herein, the Court cannot find that the retention and use is "imprudent on its face"[FN3]
as Objectant failed to demonstrate that some other investment standard or product would [*4]have been reasonable at the time the Trustee/Petitioner made the decision [FN4]
to retain the asset.
The Will expressly instructed the Estate fiduciary to transfer the residuary of the Estate, including real property, into the Trust. At the outset, the Accounting reflects that the Cat Island Property represented approximately sixteen percent (16%) of the principal received by the Trust from the Estate. While Mr. Ranson testified that any concentration over ten percent (10%) would be imprudent, for reasons explained infra, the Court does not credit this portion of his testimony.[FN5]

The evidence at the hearing, specifically, the undisputed calculations contained within the Accounting at issue demonstrated that the Trust was able to meet its obligations to Objectant throughout the relevant time period, whereby the Trustee distributed $1,116,668.23 to the Objectant for his use and benefit [FN6]
 and that the retention of the Cat Island Property had no impact on the provision of financial support to Objectant.[FN7]

Given the above, the Court finds that, at least initially, Petitioner is entitled to the benefit of the retained asset standard (See, In re JP Morgan Chase Bank, NA., 133 AD3d 1292, 1298 [4th Dep't 2015] ["retention of securities received from the creator of the trust may be found to be prudent even when purchase of the same securities might not"]).
During his testimony, Objectant's expert witness, Mr. Ranson, maintained that the Cat Island Property should have been sold in 2004 while it was an asset of the Estate. When questioned by Petitioner's counsel regarding the undisputed fact that the Cat Island Property was an estate asset in 2004, Mr. Ranson stated he was going off the Accounting and that it could have been sold as an estate asset, or at least immediately upon being received by the Trust.[FN8]

The Estate Accounting was approved and judicially settled on January 25, 2008. [*5]Accordingly, Petitioner's decision to retain the Cat Island Property in her capacity as Executrix from 2004 through either January 25, 2008 (the date of the Settlement Decree) or April 4, 2008 (the date of the actual Deed), is not properly before the Court in this proceeding and Objectant is barred res judicata from challenging that decision (In re Rudin, 34 AD3d 371, 372 [1st Dep't 2006]).
Thus, the relevant period to evaluate Objectant's challenges to Petitioner's actions regarding the Cat Island Property is from either January 25, 2008 (the date of the Decree in the estate), or April 4, 2008, until the Property was sold on January 14, 2022, for Four Hundred Eighty-Five Thousand Dollars ($485,000.00). For purposes of this decision, the Court finds that the January 25, 2008 date of the final estate decree should control as to when the Trust had constructive legal authority and financial responsibility for the Cat Island Property, regardless of its date of actual transfer.
As to the salability of the Cat Island Property, Petitioner's counsel objected to Mr. Ranson's ability to opine on real estate matters; specifically, on whether the Cat Island Property was improperly retained as he had no relevant real estate expertise. Objectant's counsel argued that Mr. Ranson's testimony would be that the real property should have been sold and "invested in mutual funds or securities" — in other words, discussing asset classes rather than real estate specifics. The Court reserved on Petitioner's Objection, permitted the testimony, and now addresses it herein. 
Mr. Ranson was not admitted as an expert in real estate and its value and Objectant offered no such expert testimony, such as to other Cat Island home sales, rental rates, market conditions, or adequacy of the sales price. Therefore, Petitioner's objection to Mr. Ranson's testimony is overruled, and the Court will consider the same. 
Mr. Ranson's testimony that the Cat Island Property should have been sold immediately in 2004, or at least immediately upon receipt by the Trust, is entirely speculative. This is evidenced by Mr. Ranson's admissions that he did not consider any historic market data or other information relating to the real estate market or valuation of houses on Cat Island, including the 2008-2009 global financial crisis or the COVID-19 pandemic.[FN9]
Further, despite Mr. Ranson's testimony regarding his personal familiarity with the Bahamian islands, he has no expertise in real estate dealings from which he could opine on if market conditions could have facilitated such a sale of the Cat Island Property prior to 2022. In addition, he was unable to testify as to the fundamentals of living on the island, the rental season, the market value of Cat Island rental properties, or anything specific in valuing the Cat Island Property. In contrast, Petitioner visited the island annually for many years and testified as to her efforts to market the property and the difficulties involved therewith.[FN10]
The Court may therefore reject any such portions of Mr. Ranson's testimony (Montesione v. Newell Rubbermaid, Inc., 192 AD3d 680, 682 [2d Dep't 2021] ["expert's opinion not based on facts is worthless" [internal citation omitted]). Given the [*6]above, the Objectant failed to prove the date by which the Cat Island Property should have been sold, or even that it could have been sold prior to 2022. 
There was also conflicting evidence regarding the Trust's date of acquisition of the Cat Island Property. As noted by the Court in its March 27, 2024 Decision and Order, the decedent's estate was judicially settled by Decree dated January 25, 2008. Introduced at the hearing was a Deed from the Estate to the Trust dated April 4, 2008. The Court further notes that the Accounting reflects an apparent 2004 inventory date for the Cat Island Property along with numerous transactions and expenses relating thereto that pre-date 2008. The parties stipulated to the accuracy of the accounting and as set forth above, the Court finds that the January 25, 2008 date controls.[FN11]

Objectant contends that Petitioner's desire to travel to the Cat Island Property also improperly influenced her decision to retain it as a Trust asset. Petitioner admitted that she wanted her trips to the Cat Island Property to be a vacation for her as well; however, her testimony also qualified that position in that she had only a set amount of vacation each year, as trustee she was obligated to oversee the Cat Island Property, and that she would have rather gone to Jamaica or the Virgin Islands for vacation. Although the Court has reservations and questions the Petitioner's credibility concerning her leisure use of the Cat Island Property, under the totality of the evidence presented the Court cannot find that Petitioner's travel plans standing alone improperly influenced her retention of the Cat Island Property. 
As discussed in further detail below, even if the Court had found Petitioner breached her fiduciary duty in this regard, the Court finds that the Objectant has failed to prove any damages. 
II. Breach of Fiduciary Duty in Travel to Cat Island Property
Objectant also contends that Petitioner's travel to and use of the Cat Island Property was a breach of her duties in that it was used primarily for personal use rather than for Trust business. To avoid a conflict of interest or self-dealing, a trustee "must refrain from placing himself in a position where his personal interest or that of a third person does or may conflict with the interest of the beneficiaries" (Matter of Rothko's Est., 43 NY2d 305, 318 [1977] [internal citation omitted]).
At the hearing, Petitioner freely admitted that she intended her trips to the Cat Island Property to be for both trust business and personal use with a vacation component. Petitioner testified that her partner usually traveled with her, and on at least one (1) occasion a friend also visited with her. It is undisputed that Petitioner did not compensate the Trust for her usage of the Cat Island Property and that the Trust paid for Petitioner's travel to and from Cat Island. Petitioner's uncontested testimony was that her partner's and guests' travel were paid for by those individuals and not the Trust. 
Notwithstanding the above, Petitioner also testified that the primary purpose of her trips to Cat Island were for Trust business. Petitioner testified that while on Cat Island, she would meet with property managers, make and/or oversee certain repairs to the Property, and do general upkeep. She further elaborated that her partner and her guests would also assist in the physical maintenance of the Cat Island Property. Petitioner testified that work benefitting the Trust comprised at least fifty percent (50%) of her time spent on Cat Island, with the remainder [*7]being for personal vacation. Petitioner also testified that she would intentionally travel to the Cat Island Property during the peak season so that she could enjoy her time there as well, and that on the years she traveled to Cat Island, she stayed between one (1) and three (3) weeks, presumably during which time the property was not generating rental income. 
The Court finds that once per year trips to the Cat Island Property for Trust business would be entirely reasonable given Petitioner's fiduciary duties to manage the Trust assets (Matter of Est. of Kenney, 64 117 N.Y.S.3d 800 at *5 [NY Sur. 2019]). However, the analysis does not end there, given the mixed-use nature of the trips. To this point, Mr. Ranson testified that a trustee's de minimus use of a Trust vacation asset is allowable without compensating the Trust. He further opined when asked to give an example of de minimus use that the use of a vacation property for Trust business for two days out of a three or four day trip (approximately 33% to 50%) would be de minimus. It should be noted that 50% was the length of time that Petitioner testified she used for personal vacation on the property.
The Court recognizes that Petitioner's extended stays at the Cat Island Property were potentially inappropriate, especially in light of some portions of her testimony.[FN12]
Unfortunately, no evidence was elicited at the hearing that would allow the Court to render such a finding as a matter of law. The record contains no actual travel dates of Petitioner that would indicate the length of stay on Cat Island, nor does it contain details, such as a contemporaneous log of work, receipts, or plans which would evince the work Petitioner performed during those stays. Indeed, as noted, Objectant's own expert testified on direct examination that the 50% use was reasonable, and such testimony was uncontroverted. As such, the Court is constrained to deny Objectant's allegations that Petitioner breached her fiduciary duties during her trips to the Cat Island Property.
Were the Court able to find that all or some of Petitioner's use of the Cat Island Property was inappropriate, the record is likewise inadequate to establish any damages. Although Petitioner testified vaguely to a range of one thousand dollars ($1,000.00) to fifteen hundred dollars ($1,500.00), no evidence was introduced as to the actual weekly rental rate for the Cat Island Property during the periods of her use. There was also no evidence submitted as to what dates the Cat Island Property was rented to third parties, the dates of Petitioner's time there, or even that Petitioner's peak season stays prevented income to the Trust from a potential renter. On the record before it, the Court cannot accurately determine the scope of Petitioner's mix of personal and business use of the Cat Island Property, that the same was inappropriate, nor can it establish any accurate measure of damages to attribute to a potential finding. 
III. Testimony of Charles Ranson and Damages Calculations
Objectant argues that in evaluating the Cat Island Property, the correct formula for damages is the "lost profit" standard due to the Petitioner's breach of fiduciary duties — in this case, the value of the sale proceeds of the Cat Island Property had it been sold and the proceeds reinvested in traditional securities. Petitioner argues for the "lost capital" standard — in this case, the difference between the total cost of the Cat Island Property and the final net sales price. Both parties cite to Matter of Est. of Janes, 90 NY2d 41 (1997) and Matter of Rothko's Est., 43 NY2d [*8]305 (1977) in support of their positions. 
As outlined above, the Objectant failed to prove that Petitioner breached her fiduciary duties, and as such, damages calculations are not necessary.[FN13]
However, assuming arguendo, that the Court could find some level of breach of fiduciary duty, under these facts, it would not rise to the level of conflict of interest and intentional self-dealing as examined in Rothko [FN14]
, supra, and its progeny. As such, any damages calculations with regard to the Cat Island Property would properly be analyzed under the lost capital/profit standard and the Accounting, as submitted on its face, clearly proves that as a result of the sale of the Cat Island Property, there was no attributable loss of capital — in fact, it generated an overall profit to the Trust.
Objectant also relied upon Mr. Ranson in offering proof of damages due to the retention of the Cat Island Property. Mr. Ranson prepared a "Preliminary Expert Report of Charles W. Ranson" dated December 14, 2022 which was admitted into evidence over objection as Respondent's Exhibit "F1". Mid-hearing he also prepared what is referred to as a "Supplemental Damages Report" dated May 28, 2024 that was admitted into evidence over objection as Respondent's Exhibit "K".
The Court finds several aspects of Mr. Ranson's testimony and reports lacking. In addition to citing an outdated version of the Prudent Investor Act, Mr. Ranson admitted that he was not aware of—and thus did not consider—the differences between lost capital and lost profit damages calculations.[FN15]
The reports and testimony make clear that Mr. Ranson's damages analysis were also calculated from a start date of December 31, 2004, which as set forth above, is more than three (3) years too early. 
Mr. Ranson's initial report contains deficiencies that were not rehabilitated by his testimony. For instance, in the table on page five (5) of the report, Mr. Ranson did not factor in expenses which must have been incurred by the Trust such as real estate taxes in years 2004 through 2013 [FN16]
, 2016, 2017, and 2020. The report fails to factor in the effect of the COVID-19 pandemic on the rental income in 2020 and 2021. In his report, Mr. Ranson asserts vague references to the economic conditions of the island which were solely supported by reference to a hearsay conversation he had on the telephone with one Robin Brownrigg.
The report states that the Cat Island Property resulted in an accumulated net operating [*9]loss of $149,643.92 [FN17]
. Coupled with the failure to account for real estate taxes, Mr. Ranson's report sets forth calculations encompass years that the property was not yet owned by the Trust (2004-2008). Another example of unreliability is that in Mr. Ranson's chart analysis of Asset Classes on page four (4) of his report, it appears that he failed to take into account the distributions to the Objectant in each year, which would naturally have an effect on the percentage of value assigned to the traditionally invested assets and cash. He refers to the property as being "illiquid", and while he does reference that the property sold in 2022 for $485,000.00 resulting in a reinvestment of the sales proceeds of $323,721.68, this reinvestment is not reflected in the chart on page four (4) in any discernable mathematical fashion other than as a footnote. The chart reflects a total year end market value on December 31, 2021 of $872,322.07 and a total year-to-date market value on April 30, 2022 of $843,727.27. If the Cat Island Property was sold and reinvested, either this value was not added into the chart or distributions to Objectant were not factored in, or perhaps there was some other unknown factor which would require speculation on part of the Court. The Court declines to engage in speculation as to what the year-to-date market value was on April 30, 2022, and instead finds Mr. Ranson's calculations contained within the initial report to be inherently unreliable.
Mr. Ranson makes the conclusion in his report that the "Trustee's decision to retain, and subsequent management of the Cat Island Property did not enable the Trustee to make appropriate present and future distributions to or for the benefit of the Beneficiary . . . ." This is squarely refuted by the accounting itself which reveals that the Objectant was provided with direct distributions of cash as well as payments for his benefit in the sum of $1,116,668.23, leaving a principle balance of $857,471.43 on hand as of the conclusion of the accounting period. Indeed, at the time the hearing concluded on June 7, 2024, the Objectant was slated to receive a future non-discretionary distribution from the Trust of approximately $175,000.00 on July 10, 2024, when he attained the age of forty (40)[FN18]
. As such, all past [FN19]
and, due to the timing [*10]of this hearing, even a future distribution was realized. Mr. Ranson's Supplemental Damages Report also failed to account for any tax deductions or write-offs that the trust benefited from relating to the Cat Island Property. Mr. Ranson also admits that he made certain assumptions of closing costs for the hypothetical sale of the Cat Island Property at its book value to arrive at the $250,000 starting figure.[FN20]
Despite Mr. Ranson making assumptions regarding a hypothetical sale in 2004, it is troubling that his Supplemental Damages Report failed to account for the proceeds from the actual sale of the Cat Island Property for $485,000 in 2022. 
Perhaps even more troubling is that Mr. Ranson further testified that he used a proxy investment account — the Vanguard Balanced Index Fund — to estimate the hypothetical investment performance of the hypothetical 2004 sales proceeds in his Supplemental Damages Report [FN21]
. This is despite Mr. Ranson testifying that the appropriate calculations would have required a full A.M.R. analysis, which he testified is the industry standard, and that this was not done because it was too costly, a statement that would normally end the Court's inquiry as to the reliability of an expert's analysis [FN22]
. In fact, Mr. Ranson testified that an industry compliant A.M.R. analysis would have required combing through the approximately two hundred sixteen [*11](216 [FN23]
) investment statements from the Trust's investment firm to obtain, at least in part, asset cost basis, dividends, interest, and compare with cash flow. The report also appears not to account for taxes or index fund management fees in its calculations; instead relying upon the raw percentage of fund value increase over the time-period. 
Based on the uncontroverted evidence, the Court finds that Mr. Ranson's calculations and specifically those with regards to damages are inherently unreliable, are based on speculation, hypothetical market performance, and are unsupported or outright contradict by facts in the record (See Montesione, 92 AD3d at 682; see also Williams v. J.P. Morgan & Co., 199 F. Supp. 2d 189, 195 [S.D.NY 2002] [discussing Janes and concluding that "the measure of appreciation damages for a wrongfully retained asset is too speculative. To grant them, a court would be forced to generate and assign real-world value to the hypothetically reinvested proceeds from the asset."]).
In conclusion, Mr. Ranson's damages calculations cannot be credited as they are unreliable.[FN24]
Whether or not he was retained and/ or qualified as a damages expert in areas other than fiduciary duties, his testimony shows that he admittedly did not perform a full analysis of the problem, utilized an incorrect time period for damages, and failed to consider obvious elements into his calculations, all of which go against the weight and credibility of his opinion.
Use of Artificial Intelligence
Although the Court has found his testimony and opinion not credible based upon the discussion above, a portion of his testimony bears further and separate discussion as it relates to an emerging issue that trial courts are beginning to grapple with and for which it does not appear that a bright-line rule exists.
Specifically, the testimony revealed that Mr. Ranson relied on Microsoft Copilot, a large language model generative artificial intelligence chatbot, in cross-checking his calculations. Despite his reliance on artificial intelligence, Mr. Ranson could not recall what input or prompt he used to assist him with the Supplemental Damages Report. He also could not state what sources Copilot relied upon and could not explain any details about how Copilot works or how it arrives at a given output. There was no testimony on whether these Copilot calculations considered any fund fees or tax implications.
The Court has no objective understanding as to how Copilot works, and none was elicited as part of the testimony. To illustrate the concern with this, the Court entered the following prompt into Microsoft Copilot on its Unified Court System (UCS) issued computer: "Can you calculate the value of $250,000 invested in the Vanguard Balanced Index Fund from December 31, 2004 through January 31, 2021?" and it returned a value of $949,070.97 — a number different than Mr. Ranson's. Upon running this same query on two (2) additional UCS computers, it returned values of $948,209.63 and a little more than $951,000.00, respectively. While these resulting variations are not large, the fact there are variations at all calls into question the [*12]reliability and accuracy of Copilot to generate evidence to be relied upon in a court proceeding.
Interestingly, when asked the following question: "are you accurate", Copilot generated the following answer: "I aim to be accurate within the data I've been trained on and the information I can find for you. That said, my accuracy is only as good as my sources [FN25]
so for critical matters, it's always wise to verify.
When asked "are you reliable", Copilot responded with: "[y]ou bet. When it comes to providing information and engaging in conversation, I do my best to be as reliable as possible. However, I'm also programmed to advise checking with experts for critical issues. Always good to have a second opinion!" When the follow-up question of "are your calculations reliable enough for use in court" was asked, Copilot responded with "[w]hen it comes to legal matters, any calculations or data need to meet strict standards. I can provide accurate info, but it should always be verified by experts and accompanied by professional evaluations before being used in court . . . "
It would seem that even Copilot itself self-checks and relies on human oversight and analysis. It is clear from these responses that the developers of the Copilot program recognize the need for its supervision by a trained human operator to verify the accuracy of the submitted information as well as the output.
Mr. Ranson was adamant in his testimony that the use of Copilot or other artificial intelligence tools, for drafting expert reports is generally accepted in the field of fiduciary services and represents the future of analysis of fiduciary decisions; however, he could not name any publications regarding its use or any other sources to confirm that it is a generally accepted methodology. 
It has long been the law that New York State follows the Frye standard for scientific evidence and expert testimony, in that the same is required to be generally accepted in its relevant field (see Frye v. United States, 293 F. 1013 [D.C. Cir. 1923]). 
The use of artificial intelligence is a rapidly growing reality across many industries. The mere fact that artificial intelligence has played a role, which continues to expand in our everyday lives, does not make the results generated by artificial intelligence admissible in Court. Recent decisions show that Courts have recognized that due process issues can arise when decisions are made by a software program, rather than by, or at the direction of, the analyst, especially in the use of cutting-edge technology (People v Wakefield, 175 AD3d 158 [3d Dept 2019]). The Court of Appeals has found that certain industry specific artificial intelligence technology is generally accepted (People v. Wakefield, 38 NY3d 367 [2022] [allowing artificial intelligence assisted software analysis of DNA in a criminal case]). However, Wakefield involved a full Frye hearing that included expert testimony that explained the mathematical formulas, the processes involved, and the peer-reviewed published articles in scientific journals. In the instant case, the record is devoid of any evidence as to the reliability of Microsoft Copilot in general, let alone as it relates to how it was applied here. Without more, the Court cannot blindly accept as accurate, calculations which are performed by artificial intelligence. As such, the Court makes the following findings with regard to the use of artificial intelligence in evidence sought to be [*13]admitted.
In reviewing cases and court practice rules from across the country, the Court finds that "Artificial Intelligence" ("A.I.") is properly defined as being any technology that uses machine learning, natural language processing, or any other computational mechanism to simulate human intelligence, including document generation, evidence creation or analysis, and legal research, and/or the capability of computer systems or algorithms to imitate intelligent human behavior. The Court further finds that A.I. can be either generative or assistive in nature. The Court defines "Generative Artificial Intelligence" or "Generative A.I." as artificial intelligence that is capable of generating new content (such as images or text) in response to a submitted prompt (such as a query) by learning from a large reference database of examples. A.I. assistive materials are any document or evidence prepared with the assistance of AI technologies, but not solely generated thereby.
In what may be an issue of first impression, at least in Surrogate's Court practice, this Court holds that due to the nature of the rapid evolution of artificial intelligence and its inherent reliability issues that prior to evidence being introduced which has been generated by an artificial intelligence product or system, counsel has an affirmative duty to disclose the use of artificial intelligence and the evidence sought to be admitted should properly be subject to a Frye hearing prior to its admission, the scope of which should be determined by the Court, either in a pre-trial hearing or at the time the evidence is offered [FN26]
.
Trustee Commissions
The Account filed by Petitioner reflects more than One Hundred Eight Thousand Four Hundred Dollars and 00/100 ($108,400.00) in commissions taken during the relevant accounting period. The unchallenged testimony of the Petitioner was that she never charged the Trust for any of the upkeep and repair work (other than supplies) she personally undertook regarding the Cat Island Property and received only statutory commissions [FN27]
.
Objectant has not challenged the reasonableness of the amount of the paid trustee commissions, rather he seeks disgorgement based upon the allegations of misconduct. As discussed at length above, the Court was unable to find that Petitioner breached any fiduciary duties in this matter. Therefore, the Court will allow the commissions as set forth in Petitioner's Account.
Accordingly, it is therefore,
ORDERED, ADJUDGED, AND DECREED based upon all of the foregoing, that the Objectant's Objections are hereby denied in their entirety; and it is further
ORDERED, ADJUDGED, AND DECREED based upon all of the foregoing, that Petition for Intermediate Accounting is granted in all respects; and it is further
ORDERED, ADJUDGED, AND DECREED that any remaining claims not specifically addressed herein are denied; and it is further
ORDERED, ADJUDGED, AND DECREED that counsel for both parties shall submit requests for attorneys fees within thirty (30) days of the issuance of this Decision and Order; and it is further,
ORDERED, ADJUDGED, AND DECREED that Petitioner's counsel shall submit a proposed Decree within thirty (30) days from the issuance of this Decision and Order.
DATED: October 10, 2024
HON. JONATHAN G. SCHOPF
SARATOGA COUNTY SURROGATE
ENTERED

Footnotes

Footnote 1:Petitioner's counsel in conformance with this Court's Local Rules stipulated to the admission of various exhibits pre-hearing. In an apparent strategic move after the exchange of pre-hearing briefings, on the first day of the hearing in an off the record discussion, counsel for Petitioner walked back that stipulation, all to the surprise of Objectant's counsel. Ultimately the exhibits at issue were offered and received, but as a matter of courteous practice the Court would caution counsel to abide by their pre-hearing stipulations.

Footnote 2:The Court notes that Mr. Ranson was present via Microsoft Teams for the entirety of all three (3) hearing days prior to giving his testimony.

Footnote 3:In as far as the Court can determine, this is not a legal standard. Based on the lack of evidence in the record, the Court declines to create a new legal standard as to a lay trustee's duties and obligations.

Footnote 4:There is no conclusive proof in the record which would establish when this decision was made or should have been made. It would appear to have been a continuously evolving thought process and decision until the Trustee decided to liquidate the property in 2022.

Footnote 5:The Court also notes that Mr. Ranson cited to an outdated version of New York's Prudent Investor Act to support this proposition, further calling into question his credibility.

Footnote 6:It should be noted that the Trust was a "discretionary trust" which allowed the Trustee to use her own discretion in making or not making distributions to the Objectant. Examples of distributions over the years of the accounting period include but are not limited to: various stipends, medical services, support payments to third parties, housing, a vehicle, and tuition.

Footnote 7:At the end of the Trust accounting period, the Amended Account reflects a total balance of $857,471.43 on hand. When asked on cross-examination what became of a $319,000.00 distribution, the Objectant testified in sum that he attempted to start a business, had drug addiction, and "I blew — blew that money."

Footnote 8:Mr. Ranson maintained this position notwithstanding the fact that he was present for the entirety of the hearing prior to offering his testimony where it was disclosed that the property was not a trust asset until 2008 as supported by the closing Decree of the estate and the deed transferring title to the property. 

Footnote 9:This lack of analysis comports with the fact that Mr. Ranson is not qualified as an expert in real estate.

Footnote 10:Petitioner also testified about her 2019 proposal to liquidate all Trust assets, including the Cat Island Property, and purchase an annuity for Objectant, which, per Petitioner, would have produced a steady income stream; a plan ultimately not agreed to by Objectant.

Footnote 11:In any event, as Objectant failed to meet his evidentiary burden to establish that the Cat Island Property could have been sold prior to the 2022 sale date, the Trust's date of acquisition is moot.

Footnote 12:Petitioner testified that part of her reason for being on Cat Island "was to establish our presence as Cat Island owners . . . with neighbors" and that she probably could have shortened her trips to only a few days if kept "strictly business."

Footnote 13:"[L]iability for a trustee's negligent retention of stock requires not only a showing of imprudence but proper proof of damages. It is clear that in order to establish what these damages are an objectant must prove at trial the time when the trustee should have sold the shares" (Matter of Wellington Trs., 41 Misc 3d 1221[A] [2013 Nassau Sur. Ct.] [internal citations omitted] [emphasis added]).

Footnote 14:The fiduciaries in Rothko were found to have self-dealt by selling paintings worth millions of dollars to entities they controlled, including transferring paintings in violation of a temporary restraining order and a later injunction order.

Footnote 15:Presumably, an expert on damages would be well-versed in both calculation models.

Footnote 16:The Trust did not own the property until 2008.

Footnote 17:Per Mr. Ranson's calculations, in 2008-2009 the Trust lost $166,271.17 out of the traditionally invested assets presumably due to the market forces of the then global financial crisis that was touched on during testimony at the hearing. This is a sum greater than Mr. Ranson claims was a result of the Trustee retaining the property, yet he conceded the traditionally invested assets were prudent. Likewise, his calculations show the investment portfolio in total gained $189,431.61 from 2005 to April 30, 2022. By the Court's calculations using Mr. Ranson's report, the property generated a net profit of $174,077.76 over the same time frame due to its retention and sale.

Footnote 18:Post-Hearing, on June 24, 2024, upon due application, this Court approved a partial assignment of that distribution ($70,000.00) in order to pay for the Objectant's incurred legal fees of $33,914.93 and the fee for Mr. Ranson of $25,117.50 with the balance to be a retainer for future legal fees.
Footnote 19:Objectant did not dispute the sufficiency of the past discretionary distributions by Trustee and conceded during the proceedings of this accounting that the traditionally invested assets were prudently managed, a point on which Mr. Ranson agreed in his initial report. The Trustee has even consented to the Trust distributions for all of Objectants legal fees and disbursements.
Footnote 20:The Court notes again, that Mr. Ranson is not qualified as an expert in real estate and offered no basis for his closing cost assumptions. Indeed, these cost calculations differed substantially from those actually incurred by the Trust upon the sale of the property, which were reflected on the closing statement from the sale. The closing costs on the closing statement were $38,070.00 vs. the $20,000.00 estimated in the report. The error in not knowing the customary costs of a real estate transaction alone is reflective of his lack of expertise on transactions involving Bahamian property.

Footnote 21:A more proper comparison would have been an analysis of the profit and loss by performing a calculation using the fund(s) that the traditionally invested assets of the trust were invested in during the relevant time-period. The use of the VBINX fund is entirely speculative as it assumes this is the fund that the Trustee would have selected.

Footnote 22:The Court is puzzled by the statement that the AMR analysis would have been too costly considering that Mr. Ranson states on page two (2) of his initial report he analyzed the investor's annual statements over the eighteen (18) year period reflected in his report. Indeed, based upon the documents filed in this proceeding, Mr. Ranson was paid at least $35,092.50 and perhaps as much as $50,092.50. His hourly rate, not counting the lower billed rate of his research assistant, is $770.00, resulting in between 45 and 65 hours of work resulting in a six (6) page preliminary report and one (1) page supplemental along with his appearance at the hearing via MS Teams. It is also noted that although other requests for disbursement of fees and expenses were asked to be ordered by the Court, no request was made for authorization of the disbursement of Trust funds to conduct this analysis.
Footnote 23:Eighteen years (216/12=18), which again, Mr. Ranson stated he'd already analyzed in his initial report.

Footnote 24:The court has also considered Mr. Ranson's "Preliminary Expert Report", which his testimony failed to cure the hearsay and other reliability issues contained within, and declines to credit the same. 

Footnote 25:This brings to mind the old adage, "garbage in, garbage out". Clearly a user of Copilot and other artificial intelligence software must be trained or have knowledge of the appropriate inputs to ensure the most accurate results.

Footnote 26:As an example of how emerging these issues are, on August 7, 2024, the New York City Bar Association issued an ethics opinion (2024-5) on the use of artificial intelligence by attorneys in general. 
https://www.nycbar.org/wp-content/uploads/2024/08/20221329_GenerativeAILawPractice.pdf.
The Court references this opinion purely for informational purposes, the Court is not in any way suggesting that any witness or counsel in this matter was unethical.

Footnote 27:Petitioner testified at her deposition that she had no receipts for supplies and work.